EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ LUIS LUGO, acusado y apelante.

*Número*: CR-70-33    *Resuelto*: 9 de marzo de 1972

*Torres González & Torres González,* abogados del apelante; *Gilberto Gierbolini, Procurador General,* y *Peter Ortiz, Procurador General Auxiliar,* abogados de El Pueblo.

PER CURIAM: El apelante fue acusado de una infracción al Art. 32 de la Ley de Armas, consistente según la acusación en que "en o alrededor del 1 de septiembre de 1967, y en Río Piedras, Puerto Rico, . . . ilegal, voluntaria, intencional, maliciosa y criminalmente, apuntó con un revólver, color negro, cañón corto, que es un arma de fuego, hacia el Lic. Wallace González, sin que esto fuera un caso de defensa propia o en desempeño de funciones oficiales."

Celebrado el juicio, el tribunal le declaró culpable del delito imputádole, y luego de negarle el beneficio de una sentencia suspendida, le condenó a sufrir seis meses de cárcel.

Alega en este recurso que el tribunal sentenciador (1) "cometió error revocable al declarar culpable al acusado de infracción al artículo 32 de la Ley de Armas a pesar de que la prueba sometida por el Ministerio Público demostraba la comisión de un delito distinto y no incluido dentro de los hechos imputados", y (2) "dicho tribunal cometió error al

denegar los beneficios de la ley de sentencias suspendidas al acusado a pesar de considerar que es un caso meritorio."

Según la relata el Procurador General sucintamente y en lo pertinente, la prueba de cargo demostró lo siguiente:

"El 1ro. de septiembre de 1967 fue a visitar al apelante Lugo en su residencia. Llegó allí en un taxi acompañado de su padre el Lic. Francisco González. El acusado-apelante los invitó a pasar adentro. Todos se sentaron en la mesa del comedor. El testigo le explicó al apelante que llevaba los documentos para la culminación de un pleito civil entre el Arzobispado de San Juan y el Sr. Lugo y le dijo que traía $7,200 en efectivo. (Id. pág. 44.) El acusado comenzó a examinar las cartas y le pidió al Lic. Francisco González que se retirara, lo cual éste hizo. Luego el acusado sacó otros documentos y los colocó sobre la mesa, haciendo ciertos comentarios. Entonces ocurrió lo siguiente según lo relató el testigo en el juicio:

'Una vez saca el libro de cheques de la Providencia y lo coloca cerca de mí, en este sitio donde estaban los documentos de la iglesia, va al cartapacio y está buscando algo como estaba haciendo anteriormente, más o menos en la misma forma, se sienta y saca sus dos manos y en la mano derecha tenía un guante negro o por lo menos un color parecido a negro, bastante obscuro y en esa mano tenía un revólver color grisoso obscuro, o sea un color obscuro, plomiso [sic] obscuro y con esa mano, con ese revólver que estaba cargado me apunta a mi haciendo más o menos este descanso en la mesa. Y me dice 'Y aquí ...

HON. JUEZ:

P. Vamos a pedir al compañero el ademán que hizo el testigo para los fines de record.

R. Así, así.

HON. FISCAL:

Descansa el codo de la mano derecha sobre la mesa.

R. Así. Exacto, como a 45 grados en ambos lados, y entonces me dice "aquí hay un revólver con 6 balas para tí", y yo le digo a "ti no te da verguenza hacer una cosa como ésta", me dice "interprétalo como un atraco, como un robo o como te de la gana, pero si tu quieres salir de aquí con vida vas hacer exactamente lo que yo diga". Entonces me dice "los

papeles", ahora estoy describiendo lo que eran los documentos de la iglesia, "aquellos papeles los recoges y te los llevas, sacas los $7,200.00 y los pones en la esquina de la mesa", esa sería la esquina a mano derecha mía. "Los demás papeles los dejas, recoge tu gabán y te vas" yo entonces empecé a organizar aquella madeja de papeles de la iglesia que estaban un tanto tirados y empezé [sic] a acomodarlos poco a poco para recogerlos y llevármelos. Entonces con un gesto colérico se levanta de la silla donde hasta este momento me tiene apuntado a mí con el revólver cargado y entonces blandiendo cerca y se para más o menos a una distancia de ese escritorio a aquí.

Hon. Juez:

"¿Cuánto estipulan los compañeros para fines de record?

Lcdo. Torres González:

"Alrededor de 4 pies.

Lcdo. Belén Trujillo:

Sí.

R. Apunta ese revólver a mi cabeza y entonces dice "algo como no juegues más con esos papeles . . ."

Lcdo. Torres González:

Objeción, Sr. Juez.

Hon. Juez:

Con lugar, el testigo no puede [sic] decir lo que expresó pero no lo que se imagina.

R. Palabras, palabras de que no juegues más con esos papeles y termina.

P. Un momentito. ¿Testigo usted está seguro que eso él lo dijo o usted se lo imagina?

R. Las palabras exactas no puedo decir que fueron esas, Sr. Juez. Palabras más o menos como esas.

P. Entonces hizo una expresión, ¿verdad?

R. Hizo una expresión. Si recuerdo que dijo "porque voy a cometer un disparate", blandiendo el revólver y apuntándome a mi cabeza directamente. Entonces pues, y le dije "pués bien, tú das las órdenes tú tienes el arma" e hice exactamente lo que me dijo, tomé los papeles que estaban colocados en la esquina encima de los documentos de la iglesia, los arreglé, más o menos los agrupé, entonces a saqué los $7,200 que hasta ese momento los tenía en el bolsillo derecho, los puse

sobre la esquina derecha de la mesa, entonces me levanté, fuí recogí el gabán que había dejado allí a mano derecha y entonces salí de su casa. Al salir de la casa me encontré con papá que estaba en el balcón, cruzamos miradas y le dije "vente" y nos fuimos.' (T.E. págs. 54–58 Taquígrafa Aurelia Román Martínez)." (Informe Procurador, págs. 2 a 5.)

Si bien la prueba de cargo contiene todos los elementos del delito de robo (33 L.P.R.A. sec. 851) no es menos cierto que la prueba establece cumplidamente la comisión de una infracción al Art. 32 de la Ley de Armas que al efecto dispone:

"Salvo en casos de defensa propia o de actuaciones en el desempeño o de funciones oficiales, será culpable de delito menos grave toda persona que:

(a) .   .   .   .   .   .   .   .

(b) Intencionalmente, aunque sin malicia apunte hacia alguna persona con un revólver, pistola o cualquier otra arma de fuego; o . . . . ."

■ Se trata de dos delitos distintos, penados por diferentes estatutos. En algunos casos de robo pueden estar presentes los elementos que constituyen también el delito penado por el Art. 32 de la Ley de Armas. Sin embargo para que un acto constituya el delito de robo deben estar necesariamente presentes otros adicionales a los contenidos en el Art. 32 de la Ley de Armas, como lo son la sustracción de bienes muebles de la persona del dueño de los mismos, contra su voluntad, por medio de la violencia o la intimidación.

No estamos resolviendo ahora que el apelante pudo haber sido procesado por la comisión de los dos delitos, el de robo y el de infracción al Art. 32 de la Ley de Armas. El fue procesado únicamente por la comisión de este último delito.

■ Lo que sí resolvemos es que no existió incongruencia entre la acusación y la prueba y que por lo tanto no es de aplicación la Regla 38 (d) de Procedimiento Criminal.

Consideremos el segundo error.

■ A pesar de que el Informe del Oficial Probatorio fue favorable al acusado-apelante, el juez sentenciador le negó el beneficio de una sentencia suspendida porque entendió que la ley no le concedía facultad para ello.

No nos detendremos en la discusión de esta cuestión. La Ley Núm. 93 de 30 de mayo de 1970, le concede ahora claramente y sin lugar a dudas, esa facultad.

Por lo tanto, devolveremos el caso para que el tribunal sentenciador determine si a la luz de los hechos, los informes correspondientes y demás circunstancias pertinentes, el acusado-apelante es acreedor a recibir o no el beneficio de una sentencia suspendida.

Hemos dispuesto de los dos únicos planteamientos que hace el acusado-apelante en este recurso. No impugna la apreciación que de la prueba hizo el juez sentenciador, ni se ataca la credibilidad del testigo de cargo, Lcdo. Wallace González. Tampoco se queja el acusado-apelante de que se lesionara su derecho a un juicio justo e imparcial. Su planteamiento principal, según dejamos expuesto, es el de que los hechos establecidos por la prueba de cargo son constitutivos de un delito de robo, y no de una infracción al Art. 32 de la Ley de Armas, que es el delito por el cual se le acusó, juzgó y condenó.

La prueba de cargo y la de la defensa fue conflictiva y el juzgador de los hechos dirimió el conflicto en contra del apelante al dar crédito al testimonio del Lcdo. Wallace González. Parte de este testimonio fue corroborado por el propio acusado. Difieren, en lo que al hecho delictivo en sí respecta, en que el acusado Lugo, aunque admitió que sacó el revólver de un "file" y lo puso sobre la mesa, negó que le apuntara con él al Lcdo. Wallace González. Al dictar su fallo condenatorio el magistrado se expresó así:

"En este caso lo único que tiene que determinar el Tribunal es si el señor acusado apuntó o no intencionalmente, aunque sin malicia, con un revólver al Lic. Wallace González.

En cuanto a la versión dada por el Ministerio Público y la declaración del señor acusado coincide en todos los extremos a excepción de si se apuntó o no con el arma y a excepción de quién eventualmente retuvo los $7,200.00.

El propio acusado de la silla testifical ratifica prácticamente en todas sus partes la declaración prestada por el compañero Wallace González en cuanto a su llegada, el taxi, instrucciones, y el propio acusado en su declaración expresó el motivo de la visita del Lic. Wallace González a su casa.

El propio acusado declaró que el Sr. Wallace González habló de una supuesta transacción. Mostraron ciertos documentos. Que él rechazó dichos documentos. Que hubo una oferta de dinero. Que hubo $7,000.00 y que vio unos billetes de cien dólares. Que se le ofreció dinero al señor acusado. Que él rechazó dicha transacción porque no creía correcta la transacción y porque los papeles no hablaban del dinero.

O sea, de la propia declaración del señor acusado se ratifica prácticamente en todas sus partes la declaración prestada por el compañero Wallace González.

Como expresáramos anteriormente únicamente le resta al Tribunal determinar si se ha establecido o no la culpabilidad del acusado fuera de duda razonable o si, en otras palabras, se ha establecido fuera de duda razonable que para la fecha que se alega en el pliego acusatorio el señor acusado apuntó intencionalmente con un revólver al Lic. Wallace González sin que éste fuera un caso de defensa propia o actuaciones en el desempeño de funciones oficiales.

El Tribunal, por el resultado de la prueba en su totalidad ofrecida, estima que se ha establecido la culpabilidad del acusado fuera de toda duda razonable, por lo que el Tribunal declara al acusado José Luis Lugo culpable y convicto de Infracción al Artículo 32 de la Ley de Armas de Puerto Rico en el caso M67–1990." (T.E. II, págs. 26 a 28.)

Veamos lo que declaró Lugo sobre este extremo en el contrainterrogatorio:

"HON. FISCAL:—

P. ¿Usted dice que puso el maletín sobre la mesa, correcto?

R. Correcto.

P. Sacó un 'file' y después sacó el revólver y después sacó el 'file', correcto?

R. Yo pongo . . . .

P. Perdone, primero conteste mi pregunta si es correcto que usted declaró eso en el directo?

R. No puedo, precisamente . . .

P. No, no, quiero que me haga memoria y me diga si es correcto o no?

R. Yo le voy a decir; anteriormente lo que . . .

P. ¿Usted no contestó así?

R. Digo, si me lo pregunta nuevamente.

P. ¿Si es correcto que usted contestó que después que puso el maletín en la mesa usted sacó el 'file'?

R. Sí.

P. Después había un revólver, sacó el revólver?

R. Sí.

P. ¿Después abrió el 'file' y sacó el revólver?

R. Yo no saqué el revólver solo, el revólver con el 'file'.

P. ¿Todo a la vez?

R. Después saqué el 'file' y después un paquete del 'file' donde estaba el revólver.

P. ¿Primero sacó un 'file'?

R. Sí.

P. ¿Y después otro 'file' donde estaba el revólver?

R. Correcto.

P. Anteriormente lo que usted sacó primero fueron los 'files' no el revólver?

R. Sí, algunos porque hay muchos que todavía están ahí.

P. ¿Y esos 'files' se los iba entregando uno a la vez al Lcdo. González de un sitio a otro de la mesa?

R. Sí, señor.

P. De la misma declaración de usted en la vista del Injunction, leo de la página 88 de la transcripción donde usted dice 'pongo el maletín sobre la mesa y entonces dentro del maletín hay un revólver, pongo el revólver sobre la mesa y le entrego los documentos' o sea, usted aquí dice 'pongo el revólver sobre la mesa y le entrego los documentos' y le dice '. . . . 88 compañero . . .' 'y le digo que hiciera el favor y se saliera de mi casa'.

R. Sr. Fiscal cuando estaba . . .

Lcdo. Torres González:—

Vamos a hacer una oposición de la pregunta en cuanto a 'pongo'; esto viene de una serie de preguntas . . .

HON. JUEZ:—

Un momentito. ¿Cuál es la objeción?

LCDO. TORRES GONZÁLEZ:—

La objeción es que el testigo, le está leyendo el Fiscal, le está leyendo al testigo que no tiene. . . .

HON. JUEZ:—

Sin lugar la objeción. El testigo puede declarar si se hizo la pregunta o no.

R. Sr. Fiscal, cuando estaba haciendo esa pregunta no estaba entrando en los hechos del caso que estamos viendo hoy, hablamos sobre el caso de Injunction y el Lcdo. Ochoteco que en Paz descanse me preguntó y no entra en los detalles si fue primero; todo aquello o si meramente entra la cosa por primera . . . , ahora se lo estoy explicando en detalles.

HON. FISCAL:—

P. No se lo pregunta. ¿Es correcto lo que declaró en esa vista 'pongo el maletín sobre la mesa entonces dentro del maletín hay un revólver. Pongo el revólver sobre la mesa y le entrego los documentos y le digo que hiciera el favor y se saliera de mi casa'.

R. Sí, señor yo declaré eso." (T.E., pieza I, págs. 349–353.)

El testimonio de Lugo fue contradicho no solamente por el Lcdo. Wallace González, sino también por el Lcdo. Omar Cancio. Lugo declaró que tuvo conocimiento de la oferta de $7,000.00 para transigir el caso cuando el día primero de septiembre de 1967 el Lcdo. Wallace González se los ofreció en la visita que le hizo a su casa. Lugo también da a entender que la visita que le hizo el Lcdo. González fue sin que mediara invitación.

Sin embargo, el Lcdo. Cancio declaró que hacía 5 ó 6 semanas que venía bregando con el asunto de Lugo, como abogado suyo y que habían convenido ultimar una transacción el día primero de septiembre en su oficina, y que Lugo recibiría $7,000.00. Declaró además que en vista de que Lugo no se presentó a su oficina a la hora convenida llamó a Lugo por teléfono y éste le contestó que estaba mal; que el Lcdo. Wallace González fuera a su hogar acompañado por alguien.

En este caso el fiscal no suprimió evidencia y por lo tanto no opera la presunción de que toda evidencia voluntariamente suprimida resultaría adversa si se ofreciere. Si bien es cierto, y sobre ello no hay controversia, que el Lcdo. Francisco González, Jr., acompañó a su hijo Wallace González a la casa del acusado Lugo el día de los hechos, no es menos cierto que a solicitud del propio acusado el Lcdo. Francisco González, Jr., se retiró del comedor donde se encontraban los tres reunidos y se fue al balcón de la casa, antes de ocurrir el hecho delictivo imputado al apelante. No surge del récord que él presenciara dichos hechos por lo que su testimonio no podía arrojar luz alguna sobre el delito imputado a Lugo.

Es muy dudosa la admisibilidad del testimonio del Lcdo. Francisco González, Jr., sobre lo que más tarde y ya de regreso en el taxi, le relatara su hijo sobre lo ocurrido en la casa de Lugo porque como testimonio de excepción a la regla de prueba de referencia, no parece cumplir los requisitos que ha establecido la jurisprudencia.

En todo caso, sin embargo, la presunción establecida en la Ley de Evidencia, es solamente un elemento de prueba a ser considerado conjuntamente con la demás prueba cuando sobre ello se llama la atención al juzgador. Ni en el tribunal sentenciador ni ante este Tribunal el acusado-apelante se ha quejado de que el fiscal suprimiera evidencia alguna. En el juicio el acusado demostró interés en conocer el testimonio del chofer del taxi que condujo al Lcdo. Wallace González y a su padre a la residencia de Lugo. El fiscal no tenía esa declaración y el acusado desistió de su planteamiento. En cuanto al posible testimonio del Lcdo. Francisco González, Jr., no mostró interés alguno ni hizo planteamiento alguno relacionado con dicho testimonio. Si a pesar de que en determinado caso surja una presunción de esa naturaleza, el juzgador se convence por la demás prueba de que el acusado es culpable del delito imputádole más allá de duda razonable, su fallo

condenatorio debe ser sostenido en apelación, en ausencia de otros errores que ameriten su revocación, lo cual no ocurre en este caso.

Si bien los hechos delictivos ocurrieron el día primero de septiembre y la denuncia se hizo el día 19 del mismo, no puede inferirse de ese hecho que la denuncia fuera falsa. El mismo día de los hechos, el Lcdo. Wallace González llamó por teléfono al Lcdo. Omar Cancio pero por una objeción de la defensa no se permitió que el testigo Lcdo. Cancio declarara sobre lo que le informara el Lcdo. González.

El mismo día de los hechos el Lcdo. Wallace González había relatado lo ocurrido en casa de Lugo. Cuatro días después fue a ver a un fiscal en relación con esos hechos y también habló con un juez. De suerte que el Lcdo. Wallace González no ocultó con su silencio por 18 días los hechos sobre los cuales declaró en el presente caso.

En el acto del pronunciamiento de la sentencia en este caso el acusado hizo unas manifestaciones a la corte acusando al Lcdo. González de perseguirlo injustificadamente. Ni esa acusación fue hecha bajo juramento ni se sustanció con prueba alguna. Dijo el acusado que el día antes el Lcdo. Wallace González había presentado contra él una denuncia por caución y que había sido arrestado y puesto bajo fianza. Para la fecha de esa denuncia por caución ya el tribunal había dictado su fallo condenatorio en este caso. No hay prueba de que tal denuncia fuera falsa. Por el contrario, lo que sí se puede asegurar en tal caso es que un magistrado encontró causa probable para acusar a Lugo.

Finalmente diremos que tampoco afecta la credibilidad del testigo Lcdo. Wallace González el hecho de que fuera abogado de la parte demandante en un pleito sobre *injunction* y sentencia declaratoria incoado por el Arzobispo señor Aponte Martínez contra el acusado señor Lugo. Precisamente debido a esas relaciones surgieron los hechos criminales de este caso.

Unimos como apéndice de esta opinión, las conclusiones de hecho formuladas por el tribunal sentenciador y que fueron confirmadas por este Tribunal en el caso de *Aponte Martínez v. Lugo*, resuelto en 29 de noviembre de 1971. 100 D.P.R. 282.

De todo el récord surge que el juez sentenciador dirimió correcta e imparcialmente el conflicto de la prueba en contra del acusado-apelante, haciendo así cumplida justicia.

*Se dictará sentencia de conformidad.*

El Juez Presidente Señor Negrón Fernández, el Juez Asociado Señor Hernández Matos y el Juez Asociado Señor Martín, no intervinieron. El Juez Asociado Señor Rigau emitió una opinión disidente, con la cual concurre el Juez Asociado Señor Torres Rigual. El Juez Asociado Señor Martínez Muñoz concurre en voto separado, con el cual están conformes los Jueces Asociados Señores Pérez Pimentel, Dávila y Ramírez Bages.

— A P É N D I C E —

*Opinión Per Curiam*
Cr-70-33

## "CONCLUSIONES DE HECHOS

I Para fines del mes de mayo de 1967 y para empezar el primero de junio de 1967, el demandante Luis Aponte Martínez, Arzobispo de la Archidiósesis de San Juan, nombró al demandado administrador de los bienes de la Iglesia bajo los siguientes términos y condiciones:

a) El empleo sería a prueba por el término de dos meses (2), el que continuaría al expirar dicho término a opción y discreción de la parte demandante.

b) El sueldo que habría de recibir el demandado sería de $1,200.00 mensuales.

II Hacia fines del mes de julio de 1967, el demandante llamó a su oficina al demandado y le informó que, aunque estaba satisfecho con parte de la labor realizada por él, no lo estaba con relación al aspecto económico y los gastos, advirtiéndole que

posiblemente tendría que prescindir de sus servicios. A principio del mes de agosto de 1967 sostuvo otra conferencia con el demandado, indicándole su determinación final de prescindir de sus servicios.

III La parte demandante concedió y pagó al demandado el sueldo de un mes no trabajado al momento de su despido.

IV El día 15 de agosto de 1967, el demandante recibió una carta que le envió el demandado (Exhibit 1 de la parte demandante), en la que, después de señalar alegadas irregularidades que a su juicio encontró en cuanto a la administración de los bienes de la Iglesia Católica, solicitaba del demandante que, en relación con su despido, que el demandante tomara una de tres alternativas a saber:

1—'Exposición de los motivos del despido.

2—Reintegro a mi trabajo o

3—Una justa indemnización.'

Le indicaba además al demandante, que de no acceder a su petición dentro de los términos fijados en la misma, el demandado, se proponía publicar dicha carta en la forma siguiente:

'1—Dentro de tres días después de usted recibir este informe y de no tener decisión o comunicación de Vuestra Excelencia, le remitiré copia a todos los obispos de Puerto Rico, a la Nunciatura de Santo Domingo y a la Secretaría de Estado de su Santidad.

2—Si a los diez (10) días su Excelencia Reverendísima no ha tomado una decisión satisfactoria, remitiré copia a todos los sacerdotes de la isla.

3—Si a los cinco (5) días no han atendido mis demandas será remitida a todas las personas que tengan relación con los fondos del Hospital de la Providencia, Instituciones Protectoras de Niños Pobres, Departamento de Justicia y a todas las personas que tengan relación con el Seminario.

4—Si mis razones no fueren atendidas, llevaría mi reclamación laboral a los Tribunales competentes.

Con esto quiero lograr evitar el escándalo y al mismo tiempo no ceder en unos derechos indiscutibles. No dependerá de mí, ni se me podrán imputar las consecuencias morales de estos actos, ya que será su decisión que determine las acciones a pesar.

Siendo un asunto, como dije al principio, de relación laboral, le suplico evite las implicaciones religiosas, y que ello respondería otro aspecto, aún más doloroso del asunto.'

V  Al recibir dicha carta, el demandante se asesoró con sus abogados sobre la misma y se llevaron a cabo dos entrevistas, en el curso de las cuales el demandado solicitó del demandante por conducto de su abogado Lcdo. Wallace González que le pagase la suma de $89,000.00, y le suministrase a su propio costo siete (7) pasajes de avión que habrían de ser utilizados por el demandado para irse con su familia para Hawaii, todo ello como precio para él no llevar a cabo las amenzas que exponía en su antes mencionada carta.

VI  La parte demandante rechazó de plano dicha solicitud, indicando que si su abogado le hacía cualquier recomendación razonable, estaría dispuesto a darla como un acto de benevolencia o generosidad pero no como dar una cantidad de dinero para evitar que la carta no circulara. El señor Lugo dijo que por esa carta estaba dispuesto a ir a la cárcel (T.E. págs. 36–37) al indicarle su abogado sobre las pretensiones del demandado, el demandante le indicó que no aceptaba ese tipo de indemnización ni mucho menos dar ninguna clase de dinero en esa forma, que prefería llevar el asunto a la corte (T.E. pág. 41), lo que motivó la presentación de la presente acción, en la que se solicita que (a) se dicte Sentencia Declaratoria en el sentido de que la parte demandada no tiene derecho a ninguna compensación por el despido, en adición a la mesada ya recibida; y (b) que se decrete un Injunction Preliminar y en su día uno Permanente prohibiendo al demandado la publicación o circulación de la mencionada carta.

Resumiendo las aseveraciones que se exponen en el Exhibit I de la parte demandante, la posición adoptada por el demandado en el Exhibit I, es la siguiente:

(a) Que el demandado fue despedido sin justificación por el mero hecho de que comenzó a compenetrarse de asuntos que entendía eran sensitivos y delicados para la Iglesia.

(b) Que el demandado entendía que en el año 1948 la Catholic Church Extension Society donó $50,000.00 para un Seminario, y que estos fondos se utilizaron para comprar igual suma de dinero en bonos de guerra sin saberse el destino final de dicho donativo.

(c) Que el demandado entendía que los fondos recomendados para el Hospital de la Providencia se habían destinado en parte a préstamos y adquisiciones de propiedades en perjuicio de los donantes.

(d) Que el demandado entendía que las propiedades donadas por el Marqués de Vallejo en el año 1891 a la Sociedad Protectora de los Niños Pobres de Puerto Rico se habían utilizados para otros fines sin que se hubieran beneficiado niños pobres de Puerto Rico.

(e) Que el demandado entendía que se habían 'penalizado' a las parroquias con una cuota trimestral que producía un impacto económico negativo para las actividades de las parroquias.

Analizaremos la posición adoptada por el demandado, según la hemos expuesto bajo las letras a, b, c, d y e.

(a) En relación con la posición adoptada por el demandado en su carta informe (Exhibit 1 del demandante), la prueba dejó claramente establecido que:

El despido del demandado se debió a que el demandante no estaba satisfecho con el demandado en cuanto al aspecto económico y los gastos de administración y siendo el nombramiento por término determinado con un período de prueba por dos meses, éste podía ser despedido por el demandante a su discreción, según veremos más adelante. *Wolf* v. *Neckwear Corp.* —80 D.P.R. 537.

(b) En relación con lo expuesto en la letra (b), quedó establecido que a la fecha en que el demandado escribió su carta del 15 de agosto de 1967, ya para el año 1948 la Iglesia había librado tres cheques (Exhibits 6, 7 y 8 de la parte demandante), por la suma de $50,000.00 a favor del Seminario. Que el demandado de no haber tenido tal conocimiento debió haber hecho las gestiones investigativas pertinentes en la contaduría de la Archidiócesis (que como Administrador de los bienes de la Iglesia, tenía a su disposición), para establecer el hecho de que la suma de $50,000.00 había sido remitida en el año 1948 al Seminario.

(c) En relación con el apartado (c) quedó establecido que a la fecha en que el demandante [*sic*] escribió su carta del 15 de agosto de 1967, el demandado tenía conocimiento de que (a) los fondos del Hospital de la Providencia se hallaban resguardados; y (b) que la intención del Arzobispado era la de consultar a los donantes a ver si querían autorizar el uso de esos fondos para

otras actividades, y si la consulta era contestada en la negativa, devolverle el dinero a los donantes con sus intereses.

(d) En relación con este apartado la prueba demostró que a la fecha en que el demandante [*sic*] escribió su carta del 15 de agosto de 1967, el demandado, a pesar de haber sido Administrador de los bienes de la Iglesia, tenía a su alcance la fuente de información adecuada, de que: (a) en el año 1894 se había otorgado por el apoderado del Marqués de Vallejo una Escritura Adicional que concedía al obispo (hoy el Arzobispo de San Juan), la facultad de seleccionar los niños pobres que se beneficiarían de los donativos de la Sociedad Protectora de dichos niños pobres (Exhibit 2 del demandante); (b) que en uso de sus facultades, el Arzobispo había canalizado esa ayuda a través del Colegio de la Milagrosa donde se sostienen un gran número de niños pobres y huérfanos de Puerto Rico, a un costo que fluctúa en cerca de $40,000.00 anuales; y (c) que la finca Venezuela no era parte del donativo del Marqués de Vallejo.

(e) En relación con los señalado en la letra (e) surge de la prueba que a la fecha en que el demandado escribió su carta del 15 de agosto de 1967, el demandado como Administrador de los bienes de la Iglesia, tenía a su alcance la fuente de información adecuada, y sabía que dichas cuotas se impusieron previa reunión con los sacerdotes.

VII   La parte demandante ha sido auditada en todas sus operaciones y en relación con todos sus bienes, así como de todos los fondos a que se refiere el Exhibit I de la parte demandante hasta el año 1966 por la reputadas firmas de contables de Ernst & Ernst y de Aníbal Muñoz (Exhibit I del demandante Rebuttal y Exhibit II), contratadas como auditores externos para esos fines, habiendo sido el resultado del examen de dichos contadores que se hallaron correctas las partidas cuestionadas por el demandado.

VIII El Tribunal concluye, además, que, después de haber comenzado este pleito, el demandado designó al Lcdo. Omar Cancio para que le representara en este pleito; que el Lcdo. Cancio sostuvo una serie de entrevistas con los abogados de la parte demandante y con el propio Arzobispo que culminaron en un entendido entre el Lcdo. Cancio y los abogados de la parte demandante, en el sentido de que se concluiría el litigio sobre las siguientes bases:

(a) La parte demandante entregaría al señor Lugo la suma de $7,200.00 equivalente a seis mesadas, en efectivo, como un acto de liberalidad.

(b) A solicitud del Lcdo. Cancio, quien indicara que le sería difícil al demandado conseguir un empleo, la parte demandante entregaría al señor Lugo una carta en el sentido de que el despido no fue causado por ningún motivo moral y sí por discrepancias de carácter gerencial.

(c) El demandado entregaría al demandante otra carta en la cual admitía que la publicación o circulación del Exhibit no estaba justificada.

(d) El demandado devolvería a la parte demandante toda la documentación que había retirado sin el consentimiento de ésta de los archivos del Arzobispado.

(e) Se otorgaría un relevo recíproco, y entonces la parte demandante radicaría una Moción de Desistimiento, con un proyecto de Orden para archivo del caso.

Todos los documentos pertinentes antes relacionados fueron preparados de común acuerdo por los abogados de la parte demandante y el Lcdo. Cancio. (Declaración Lcdo. Wallace González—Págs. 131–132).

El día 1ro. de septiembre de 1967 en que el Lcdo. Cancio y el Lcdo. González Oliver contemplaban firmar los documentos y terminar el caso, el Lcdo. Cancio telefoneó al Lic. González Oliver para indicarle que el demandado no podría ir a su oficina a firmar los documentos por no sentirse bien. En el curso de la conversación, convinieron el Lcdo. Cancio y el Lcdo. González Oliver en que el Lcdo. Wallace González Oliver iría a la residencia del demandado para firmar los documentos y entregar el dinero, y así también para recoger los documentos que el demandado había retenido pertenecientes a la Iglesia, y que se había convenido serían devueltos por el demandado. El Lcdo. González Oliver telefoneó al señor Lugo, quien le dijo que estaría esperándolo en su residencia para los fines indicados.

El Lcdo. González Oliver se dirigió a la casa del demandado, acompañado por su padre el Lcdo. Francisco González, Jr. El demandado los atendió en la sala-comedor de su residencia. El Lcdo. González Oliver le entregó al demandado los documentos convenidos para que los examinara. A requerimiento del demandado, el Lcdo. González Oliver le informó al demandado que él había llevado los $7,200.00, según convenido, en efectivo.

Después de algunos comentarios por parte del demandado en cuanto a los documentos, él le pidió al Lcdo. González, Jr., que debido a las estrechas relaciones del Lcdo. González, Jr., con la Iglesia, dicho demandado prefería quedarse a solas con el Lcdo. González Oliver, ya que quería conversar privadamente con él sobre ciertos hechos. El Lcdo. González, Jr., complaciendo al demandado se retiró al balcón de la casa.

Ya antes, al llegar los Lcdos. González en un taxi a la residencia del demandado, éste le indicó al chófer del taxi que se retirara a un arbusto que se hallaba a la distancia para que se guareciera del sol.

Ya solos, el demandado y el Lcdo. González Oliver en la referida sala-comedor, el primero comenzó a extraer documentos de su maletín que se hallaba en una esquina de la mesa, en la cabecera opuesta a la que ocupaba el Lcdo. González Oliver, y comenzó a describirle al Lcdo. González Oliver dichos documentos, entre los cuales se hallaban seis o siete copias del Exhibit I de la demandante, unos seis o siete sobres con sus direcciones entre los cuales había sobres dirigidos a Monseñor Rafael Grovas y Monseñor Fremiot Torres Oliver, y una serie de documentos pertenecientes al archivo del Arzobispado que el demandado había retenido.

Que el Lcdo. Wallace González Oliver abandonó la casa del demandado sin que éste firmara los documentos que había quedado éste de firmar. (1)

---

"(1) A los efectos de este recurso, consideramos innecesaria hacer determinación alguna sobre el destino de los $7,200.00 que llevó el Lcdo. Wallace González a la casa del demandado ya que estamos frente a una acción civil (Injunction) que es una en equidad, y no frente a un caso de naturaleza criminal donde nuestra Constitución y leyes estatales conceden a las partes amplia oportunidad de establecer sus defensas. Cualquier determinación que haga el Tribunal sobre el dinero o cualquier otro incidente alegadamente ocurrido entre el Lcdo. González Oliver y el demandado, repetimos, podría afectar los derechos consagrados en nuestra Constitución a toda persona por la posible comisión de un delito, sin concédersele su día en Corte."

—O—

Opinión disidente del Juez Asociado Señor Rigau con la cual concurre el Juez Asociado Señor Torres Rigual.

San Juan, Puerto Rico, a 9 de marzo de 1972.

Me veo obligado a disentir porque mi conciencia así me lo dicta. Preferiría no tener que entrar en los detalles que siguen, pero tengo que hacerlo para que se entienda por qué disiento. De lo contrario mi disenso podría parecer caprichoso.

Creo que las circunstancias de este caso fueron tales que el apelante no tuvo un juicio justo e imparcial. Me explico en el curso de esta opinión.

Como es sabido, este Tribunal no viene necesariamente obligado a aceptar las conclusiones de hecho de los tribunales de instancia. La propia Ley dispone que este Tribunal no es un mero tribunal de casación sino que *para evitar injusticias* puede entender en todos los hechos y tramitaciones de las causas. [1]

El presente es uno de esos casos en que se hace necesario que el Tribunal cuestione, examine y revise las conclusiones de hecho del tribunal de instancia.

En este caso específico se acusó a José Luis Lugo de una infracción a la Ley de Armas, infracción que alegadamente consistió en que Lugo le apuntó con un revólver al Lcdo. Wallace González. [2] Los únicos dos testigos fueron el denunciante y el acusado. El denunciante afirmó que el acusado le apuntó con el revólver y el acusado afirmó que eso no es cierto. Los hechos alegadamente ocurrieron en el hogar del propio acusado. En su visita al hogar del acusado, el padre del denunciante acompañó a éste a casa de aquél, pero no declaró en el juicio.

---

[1] 4 L.P.R.A. sec. 36.

[2] El Art. 32 de la Ley de Armas hace delito menos grave el *apuntar* intencionalmente hacia una persona con un arma de fuego. 25 L.P.R.A. sec. 442(b).

Para situar este caso en su perspectiva real es necesario señalar que el mismo *es solamente un episodio de un cuadro de hechos mucho más amplio.* En otro caso que es también consecuencia de esos hechos, este Tribunal resumió *parte* de los mismos. (³) Relatamos en aquel caso, en síntesis, que en mayo de 1967 el Arzobispo Aponte Martínez contrató los servicios del aquí apelante, Sr. José Luis Lugo, como Administrador de las propiedades de la Iglesia Católica en Puerto Rico. Con motivo de unas importantes discrepancias que tuvieron, las cuales ya son públicas en Puerto Rico, el Arzobispo despidió a Lugo de su trabajo.

Lugo creyó injustificado su despido y le dirigió al Arzobispo una carta con fecha de 15 de agosto de 1967. En dicha carta Lugo expresaba que de no recibir contestación enviaría copia de la misma a un número de personas que allí mencionó.

Lo que tenemos que decidir en este caso que ahora nos ocupa es si debe revocarse o no la sentencia apelada. Para formar un juicio justo sobre esto es necesario conocer los hechos anteriormente mencionados y también ponderar los hechos que más adelante relaciono. Sólo así podrá apreciarse a lo que ha sido sometido el apelante y sólo así podrá juzgarse si en el caso de autos el apelante tuvo un juicio justo e imparcial.

La carta de Lugo al Arzobispo tiene fecha de 15 de agosto de 1967. El día 21 de ese mismo mes el Sr. Arzobispo presentó en el Tribunal Superior de San Juan una demanda contra Lugo en la cual solicitó del tribunal, entre otras cosas, que mediante una orden de interdicto prohibiese a Lugo dar publicidad a la mencionada carta. Un juez del Tribunal Superior declaró esa demanda con lugar y expidió una orden de interdicto prohibiéndole a Lugo publicar su escrito. Dicha orden era nula por constituir una violación de la libertad de prensa garantizada por la Constitución de Puerto Rico y por la Primera Enmienda de la Constitución de los Estados Uni-

---

(³) Véase *Aponte Martínez* v. *Lugo,* res. en 29 Nov. 1971, 100 D.P.R. 282.

dos. Dicho interdicto constituía un ejemplo de censura previa (*prior restraint*) y no podía prevalecer. El Tribunal Supremo de Puerto Rico revocó dicha orden en el antes citado caso de *Aponte Martínez* v. *Lugo*, supra.

Mientras estaba pendiente en el caso antes mencionado la cuestión de si Lugo podía o no publicar su escrito, el Lcdo. González, entonces abogado del Arzobispo, llamó por teléfono, el 1ro. de septiembre de 1967, a Lugo a su casa y le expresó su deseo de ir a verlo. Concertaron la cita para el mediodía de ese día en la residencia de Lugo, en el Barrio Cupey de Río Piedras, Puerto Rico. La conferencia se celebró en la fecha y lugar indicados. Al Lcdo. González lo acompañó ese día su señor padre a la residencia de Lugo.

Luego de los saludos usuales y ya sentados en la mesa del comedor de la casa de Lugo, el Lcdo. González le mostró unos documentos a Lugo. Estos consistían de lo siguiente:

(1) Una carta del Sr. Arzobispo dirigida a Lugo diciéndole que el motivo de la despedida era de naturaleza gerencial pero que no había razón de carácter moral alguno en dicho despido; (2) una carta preparada para la firma de Lugo, dirigida al Sr. Arzobispo, donde Lugo expresaría que los bienes de la Iglesia habían sido auditados correctamente y que no había anomalía alguna; (3) un acuerdo o carta de relevo donde el Sr. Arzobispo y Lugo acordaban no demandarse en los tribunales entre sí; y (4) un escrito de desistimiento para el tribunal.

Sobre esto Lugo declaró como sigue:

"Así que yo leí la carta, leí los documentos y le dije que no me satisfacía, le dí mi explicación entonces él me ofreció que traía una cantidad de dinero para que transara dicho pleito entonces, pues, se sacó del bolsillo una cantidad de dinero y me dijo que habían $7,000.00. Después al rato cuestión de seguridad $8,000.00 y los puso sobre la mesa donde él estaba sentado. Entonces, pues, le dije que . . . le pregunté que dónde en ese documento constaba que me iba a entregar una cantidad de dinero para que transara el pleito o como se le llamase a ésto, entonces me dijo que no

aparecía en ningún lado, que eso quedaba en secreto entre el Sr. Arzobispo, el Sr. Wallace González y yo, nosotros tres.

Hon. Juez: ¿Dónde estaba el Lcdo. González, padre, mientras estaban hablando?

R. Estaba en el balcón de mi casa como a 10 pies de distancia.
Adelante.

R. Le dije que no me parecía correcta la forma de hablar sobre este caso en la forma de que el dinero no aparecía, como un recibo o un documento . . .

P. ¿Testigo, mientras ésto ocurría usted estaba dónde?

R. Yo estoy sentado en la mesa del comedor de mi casa que tiene como unos 6 pies de largo. Yo en un extremo y él en el otro.

P. ¿Estaba como a 6 pies de usted?

R. Sí.
Adelante.

R. Le indiqué cómo era posible que ésto quedara en secreto que no me parecía que estaba bien. En primer lugar ese tipo de chanchullo." T.E. págs. 232–235.

Cuando Lugo comenzó a declarar sobre esos documentos el juez le sugirió al fiscal que objetara a base de que la mejor evidencia eran los papeles en sí, pero cuando anteriormente el testigo *de cargo* declaró sobre dichos documentos el juez guardó silencio. T.E. pág. 232.

Regresando a los hechos, es el 1ro. de septiembre de 1967 que el Lcdo. González visita a Lugo y le muestra los documentos que había preparado para el caso de que se transigiese la controversia civil entre el Arzobispo y Lugo. Como surge de lo antes transcrito, Lugo no estuvo conforme y el Lcdo. González le ofreció los $7,000.00 pero Lugo no aceptó. Es en esta etapa que, según la versión del Lcdo. González, Lugo, a punta de revólver, se apropió de los $7,000.00 que el Lcdo. González llevaba en efectivo.

Según la declaración del Lcdo. González luego de eso él y su padre tomaron el taxi y regresaron a San Juan. Vinieron desde Cupey a San Juan pero no se detuvieron en ninguno de los varios cuarteles de policía que hay en el trayecto a dar

parte del atraco de que alegadamente fue víctima el testigo de cargo. Nada dijo a la policía durante los próximos 18 días, a pesar de que—afirma—le habían robado en su presencia $7,000.00.

El caso civil del *injunction* contra Lugo estaba señalado para verse el 20 de septiembre de 1967. Es exactamente el *día antes* de dicha vista que se informa a la policía del alegado atraco ocurrido *18 días antes* y esa *noche* del 19 de septiembre de 1967 arrestan a Lugo en su hogar. Lugo describió esto en la siguiente forma:

"R. Me citaron para una vista del caso de Injunction para septiembre 20, para verse en septiembre 20.

P. ¿Se vió en esa ocasión?

R. Sí señor, se vio.

P. Le pregunto si en esa ocasión usted había sido acusado de algo?

R. La noche anterior, el día 19 de septiembre se personaron a mi casa 3 detectives con dos Ordenes de Arresto, una por el Art. 8 y otra por el Art. 32 en la cual el Lcdo. Wallace González me acusaba de no tener licencia para poseer un arma." T.E. pág. 226.

El caso por violación al Art. 8 de la Ley de Armas se resolvió a favor del acusado pues se determinó que no había causa probable. Lugo tenía licencia para poseer un arma de fuego. Creo que esta acusación fue injustificada porque era muy fácil constatar antes de presentarla si era cierto o no que Lugo tenía licencia para poseer un arma en su casa.

Sin motivo aparente se espera para arrestarlo en horas de la noche, en su hogar, creando así una aterradora sensación de ansiedad y de indefensión en su esposa y sus niños. El arresto por la noche hizo más penosa la situación de Lugo. Para proteger a las personas que en esta sociedad viven, de la crueldad que significa un arresto innecesariamente hecho de noche en el hogar de la persona, es que la Regla 10 de Procedimiento Criminal dispone que si el delito imputado es un delito grave el arresto podrá hacerse de día o de noche pero si

el delito imputado es uno menos grave el arresto no podrá hacerse por la noche, a menos que el magistrado que expidió la orden así lo autorizare. En ambos casos los arrestos pueden hacerse de día.

Arroja luz adicional sobre toda esta situación el siguiente diálogo ocurrido durante el contrainterrogatorio del testigo de cargo Lcdo. González:

"Lcdo. Belén Trujillo: ¿Dígame si es o no cierto que al otro día de radicada la denuncia en el Tribunal Superior, Sala de San Juan, frente a la Sala del Hon. Juez Rivera Barreras usted en presencia del Lcdo. García Cabrera, le pidió, le sugirió al acusado y a su abogado de que a cambio de levantarle esta denuncia usted, él tenía que desistir del caso de Injunction?

R. En ningún momento le dije al acusado que a cambio de . . . , *que se podía hacer ese cambio.*" (Bastardillas nuestras.) T.E. pág. 80.

Hasta este momento en esta narración la situación de Lugo es que está demandado en el Tribunal Superior en el caso de *injunction* y está denunciado por dos supuestas violaciones a la Ley de Armas, en una de las cuales no hubo causa probable y la otra es el caso de autos. Fue arrestado en la noche del 19 de septiembre de 1967.

Así las cosas, en 5 de agosto de 1968 contrataron a un *detective privado*—según declaración jurada del propio detective—para hacer averiguaciones en torno a Lugo.

En 4 de noviembre de 1968 el Lcdo. González presentó una denuncia sobre caución juratoria contra Lugo.

El Tribunal Superior había fijado el día *7 de ese mes de noviembre* para el acto de pronunciamiento de sentencia en el caso de autos. Arrestaron de nuevo a Lugo el *día 6,* otra vez exactamente *el día antes* del día en que estaba citado para esa vista en corte. Este arresto del día 6 de noviembre de 1968 lo basaron en la denuncia sobre caución presentada el día 4, a pesar de que ya desde el mismo día 4 estaba firmada la orden de arresto. Le fijaron a Lugo una fianza de $3,000.00

para poder permanecer en libertad, fianza que luego fue rebajada a $500.00.

Como puede verse, otra vez el tratamiento para con Lugo fue innecesariamente severo. Una persona como el apelante, con domicilio permanente en Puerto Rico, con esposa y seis niños pequeños que viven con él en su hogar, que trabaja también en Puerto Rico, no es la clase de persona que es de esperarse que desaparezca del país para no ir a juicio. Para esos casos es que precisamente este Tribunal enmendó en el año 1966 la Regla 218 de Procedimiento Criminal para darle explícitamente facultad a los magistrados para no exigir fianzas cuando no sean necesarias. En un pronunciamiento oficial de la Conferencia Judicial de los Estados Unidos (National Conference on the Judiciary) de fecha 14 marzo 1971, se dice sobre el particular:

"Las fianzas en dinero deben ser reemplazadas en gran medida por la práctica de dejar en libertad bajo su propia palabra a aquellos acusados de los cuales pueda razonablemente esperarse —en vista de sus raíces en la comunidad—que comparecerán al Tribunal el día del juicio."

También, por las razones antes dichas, no parecía necesario expedir una orden de arresto sino que pudo haber expedido una citación. También sobre el particular la National Conference on the Judiciary ha recomendado lo siguiente:

"Excepto en los casos de delitos serios cometidos por un adulto, debe expedirse una citación en vez de ordenarse un arresto." ([4])

Es de notar además que el juicio por el delito *menos grave* no se le celebró a Lugo en el Tribunal de Distrito (a pesar de que Lugo solicitó el traslado para el Tribunal de Distrito) como se hace con los demás acusados de delitos menos grave sino que se le celebró por Tribunal de Derecho en el *Tribunal Su-*

---

([4]) *Institute of Judicial Administration Report*, July 1971. En sentido parecido, véase la Regla 7 (a) de las de Procedimiento Criminal.

*perior*, en donde tradicionalmente en Puerto Rico la justicia es más severa que en los Tribunales de Distrito.

Cuando Lugo comparece ante el Tribunal para ser enjuiciado en el caso de autos llega acompañado de una presunción de inocencia. El Tribunal tiene ante sí solamente dos declaraciones: la del propio acusado que niega que le apuntó y la del testigo de cargo que lo afirma. El testimonio del testigo de cargo en este caso específico bien pudo haber estado sujeto a razonable duda. El testigo de cargo en este caso fue además el denunciante que denunció a Lugo (en el caso sobre caución juratoria) y fue el *abogado del demandante* que demandó a Lugo (el caso del *injunction*). Aún a las personas más ecuánimes y honorables la pasión momentánea los puede hacer equivocar, en contra de su voluntad. Entiendo que ante un juzgador imparcial todo eso, unido al carácter claramente conflictivo de la prueba, debió producir una duda razonable que en adición a la presunción de inocencia debió desembocar en una sentencia absolutoria.

No deja de ser significativo que en el caso de caución Lugo pudo presentar como testigos suyos de reputación a cinco personas distinguidas y de excelente prestigio en la comunidad. En el propio caso de autos el Informe del Oficial Probatorio es sumamente favorable al apelante.

Una expresión espontánea del juez en un intercambio con el fiscal en el caso de autos nos deja entrever la sicología que permeaba el ambiente en el cual este caso se vio. Dijo el juez:

*"Considerando el interés público envuelto en este caso, a pesar de que nos hemos apartado de los procedimientos, hemos querido tratar de hacer* el acto de justicia a todas las partes envueltas . . . ."* (Bastardillas nuestras.) T.E. IV, págs. 70–71.

No basta con *querer* hacer justicia, ni con *tratar* de hacer justicia; mucho menos con *"querer tratar de hacer"* justicia; es necesario *hacer* justicia.

Otro ejemplo de esa sicología que pesó sobre este proceso es el siguiente: El juez sentenciador, a pesar de que repe-

tidas veces expresó que el Informe del Oficial Probatorio "es sumamente favorable" al acusado; ([5]) a pesar de que expresó que no le concedía una sentencia suspendida porque entendía que no tenía autoridad para concederla; a pesar de que dijo "si tuviéramos autoridad en ley sí le concederíamos los derechos de sentencia suspendida" (T.E. IV, pág. 104); y a pesar de que expresó que "ojalá" el Tribunal Supremo concluyera "que estamos equivocados en nuestra apreciación de la Ley de Sentencias Suspendidas" (T.E. IV, pág. 110), al sentenciarlo le impuso una pena de *seis meses* de cárcel cuando pudo haberle impuesto el mínimo que son *30 días.* 25 L.P.R.A. sec. 442(b) y 25 L.P.R.A. sec. 451.

Estimo que es patética la manifestación que hizo el apelante al juez sentenciador cuando éste se disponía a pronunciar sentencia. El incidente es el que sigue:

HON. JUEZ: Lugo, usted quiere decir algo antes que dicte sentencia?

Acusado: Que me permitiera decir algo porque ya ocurrió un incidente que viene relacionado con este mismo asunto.

HON. JUEZ: Se le advierte que cualquier manifestación que usted haga . . . yo le aconsejo se aconseje con su abogado primero porque cualquier manifestación en el proceso . . . .

Acusado: Yo quisiera mencionarle a usted que usted tenga conocimiento, que el Tribunal tenga conocimiento cómo he sido perseguido desde el comienzo de este caso, de su origen. . . . Mire, señor juez, el año pasado en septiembre 19 cuando me arrestaron que me acusaron de artículo 8 y 32, al otro día, día 20 de septiembre se veía el caso de Injunction. Aquel día 6 de noviembre me vuelven y me arrestan en mi casa por una acusación de Coacción o Caución cuando hoy es el día se me iba a leer sentencia aquí. Piden al Tribunal que me ponga una fianza alta, me ponen $3,000.00 de fianza y yo voy donde el juez y explico el caso, la acusación que está aquí y se me rebaja la fianza a $500.00 y me dio hasta hoy para que pusiera la fianza. La acusación me la hace el licenciado Wallace González.

---

([5]) T.E. IV, págs. 102, 103, 104, 105, 118.

HON. JUEZ: ¿Qué fecha es eso?

.. Acusado: Ayer.

HON. JUEZ: Adelante.

Acusado: La acusación me la hace el licenciado Wallace González porque en todas las ocasiones estuvo presente un detective privado que se hizo pasar como amigo mío y el primer día lo conocí me dí cuenta venía con algo; en varias ocasiones me indicó que lo conocía a usted, señor juez, porque usted era miembro de la Logia y él era miembro de la Logia y me podía ayudar en este caso. Siempre mantuve mi boca cerrada porque me pareció que este individuo buscaba algo. Más adelante este señor me visitó a mi casa, entiende, bajo las condiciones en que yo estaba y estaba mi esposa me sugirió llevarme una enfermera para que atendiera mi esposa que estaba enferma y me ofreció una cantidad de dinero y más adelante yo lo llevé donde el licenciado Raúl Torres González, que él podía interceder con Wallace para arreglarnos este asunto. Este señor y Wallace González me acusaron que yo estoy planeando un Asesinato, en masa, voy a asesinar al licenciado Wallace González Oliver, por haberme acusado después que usted me sentencie, me acusa que voy a asesinar al licenciado Francisco González, a su padre, me acusa voy a asesinar al señor Arzobispo. Yo quisiera que usted leyera y viera esto, una acusación tan injusta que este hombre hace. Yo puedo probar, señor juez, que en el caso de Daños y Perjuicios que esa cantidad dice que fue por honorarios, que le entregó al licenciado Wallace González y me acusa yo le quité ese dinero. Ahora este señor me mantiene esta persecución, yo tengo seis niños, entre ellos el menor que hace 60 días nació, cómo puede pensar que yo puedo ir a planear un asesinato en masa, como el caso que este hombre me acusa aquí y este detective privado que firma esa declaración jurada para que siga esta persecución. *Yo creo tengo algún tipo de protección porque esta es una cosa injustificada, señor juez.* Yo quisiera usted leyera esta acusación lo que este hombre explica, el licenciado Wallace González Oliver y que lo firma de su puño y letra que esto es lo más absurdo que se pueda imaginar. Yo el único delito que he cometido ha sido aclarar la posición económica de cómo se usa el dinero de la clase católica. Eso es lo único malo, lo he hecho como católico, práctico y fervoroso que

soy." (⁶) T.E. IV, págs. 118–119, 122–125. (Bastardillas nuestras.)

A la luz de las circunstancias que he descrito, entiendo que en este caso el acusado fue enjuiciado en un ambiente cargado de emoción que, sin duda involuntariamente, nubló la sana discreción del juez sentenciador. En casos parecidos, en que la emoción ha sido menor, hemos revocado sentencias porque hemos encontrado que el acusado no tuvo un juicio justo e imparcial. Estoy convencido que en este caso lo justo es revocar la sentencia apelada. No creo que el acusado tuvo un juicio justo e imparcial; creo que en el mismo hay suficientes elementos para crear la duda razonable; y creo que el debido procedimiento de ley se observó *pro forma* solamente. Bajo esas circunstancias no es justo enviar a un hombre a la cárcel. Creo que nunca antes lo hemos hecho.

## II

He leído el voto separado del distinguido compañero juez. Estimo que debo puntualizar algunos extremos que allí se mencionan.

En dicho voto se dice que la prueba fue conflictiva solo en cuanto a si el apelante apuntó o no con el revólver y que sobre los demás factores no hay discrepancia. Precisamente. Si no se apunta con el arma no se ha cometido el delito aunque "sobre los demás factores no haya discrepancia." Mi posición es que todos los demás factores son irrelevantes a los efectos de condenar al apelante en este caso y que dichos factores todos crearon una atmósfera que hizo que el juicio no fuese imparcial. *Cf. Fournier* v. *People of Puerto Rico,* 281 F.2d 888 (1960) ; *cert.* denegado en 364 U.S. 915 (1960).

---

(⁶) Los puntos suspensivos que aparecen al comienzo de lo expresado por el acusado en lo antes transcrito significan que se ha omitido, por innecesario, un diálogo entre el juez, el fiscal y el abogado sobre si el juez debía permitir o no a Lugo que hablase.

También se señala en el voto separado que el apelante sacó el revólver y lo puso sobre la mesa. A mi juicio hay una gran diferencia entre sacar un revólver del bolsillo o de una vaqueta y ponerlo sobre la mesa en medio de una negociación o sacarlo *incidentalmente* al bregar en un maletín o portafolios para sacar unos documentos. Véase lo siguiente.

El fiscal le preguntó a Lugo si era correcto que él declaró "Pongo el maletín sobre la mesa, entonces dentro del maletín hay un revólver. Pongo el revólver sobre la mesa y le entrego los documentos y le digo que hiciera el favor que se saliera de mi casa." Sin vacilar Lugo contestó "Sí, señor, yo declaré eso." T.E. caso M-67-1990, págs. 352–353. Cuando se le preguntó a Lugo que por qué Lugo sacó el revólver su contestación fue "Bueno, porque cuando estaba sacando los documentos estaba dentro de los documentos."

Surge de la declaración que el revólver y los documentos estaban en el maletín y que Lugo sacó el revólver, como pudo haber sacado cualquier otro objeto que allí estuviese (un libro, un termo, etc.) y lo puso sobre la mesa y sacó los documentos en cuestión. Creo que la espontaneidad y veracidad de la declaración de Lugo es evidente. Si él hubiese sido una persona maliciosa pudo haber negado haber puesto el revólver sobre la mesa. Sin embargo, no lo negó. Claramente poner un revólver, poseído legalmente, sobre una mesa en la propia residencia de uno no es ningún delito.

En el voto se expresa que no es justo utilizar una norma que equivale a una camisa de fuerza para un testigo porque también sea abogado. Creo innecesario decir que jamás he sustentado tal pensamiento. En todo este asunto me guía una idea central. Esta es que la misión del derecho es realizar la justicia, y de eso es que aquí se trata.

En el voto separado se habla de la fe en la integridad de los jueces. Creo que eso no viene al caso. Yo también comparto dicha fe. Lo que ocurre es que esa integridad aquí no está en tela de juicio en absoluto. Precisamente en esta opi-

nión he expresado que el juez sentenciador, a mi entender, se equivocó "sin duda involuntariamente." Pero aunque yo no hubiese hecho esa salvedad, ¿acaso vamos a creer que cuando un juez disiente o cuando un abogado señala errores, eso equivale a no tener fe en la integridad de los jueces? Lo único que eso implica cuando se hace es que uno cree que el otro se ha equivocado. En absoluto pone eso en juego o en duda la integridad del juez o del tribunal del cual se apela o se disiente. Tampoco vamos a caer en el error de creer que porque los jueces somos íntegros, somos infalibles. Hay que entender que cuestionar la falibilidad no es lo mismo que cuestionar la integridad.

Se argumenta en el voto separado que según las conclusiones de una sentencia que allí se menciona el demandado había solicitado $89,000.00 y otras cosas. En primer lugar, ¿acaso eso prueba que le apuntó o no le apuntó con el revólver al testigo de cargo?

En segundo lugar, para sustanciar eso se citan unas líneas de la pág. 346 del récord del caso Civil 67-4447. Creo que puede apreciarse mejor la espontaneidad y la veracidad de esa declaración de Lugo si se comienza la lectura de ese incidente en la página anterior. Dice así:

"P. Esa cantidad de ochenta y nueve mil dólares que se alega en la demanda y siete pasajes de avión para ser utilizados por usted y su familia, explíqueme esa situación, si eso es correcto.

R. El debe tener, el Lic. González, en su maleta, si mal no recuerdo, *él tenía un pad amarillo como el que tiene ahí, donde él multiplicó por diez años el salario que yo recibía anual, entonces lo dividió* entre dos y creo que me dijo que daba entre noventa, ochenta o setenta y cinco, por ahí, más o menos. Como no tenía mi mente en esa cuestión de dinero ni estaba, cómo diría . . . como abogado, ni entendía que estaba hablando como abogado, como su abogado, le dije—'mira, vamos a pensar esto y tú me llamas el lunes.' El me dice—'vamos a hacerlo así porque yo estoy de vacaciones pero ya es un poquito tarde.' El no había almorzado todavía ni yo tampoco, pero seguimos hablando, entonces,

cuando él me acompaña a la puerta de su casa, me da la mano y me saluda, yo, en forma de broma le digo—'dile a Monseñor que me mande algo para dar un viaje', pero no mencioné nunca pasajes para Hawaii. Por qué me voy a ir yo para Hawaii si yo tengo mi familia aquí?

P. Su familia consta de muchas personas?

R. Yo tengo cinco niños, mi esposa y yo.

P. Son siete?

R. Siete, sí, señor.

Hon. Juez: La broma fue que le dieran cuántos pasajes?

R. Que me diera un pasaje para dar un viaje, no mencioné cantidad de pasajes.

P. No dijo cuántos?

R. No, señor."—T.E. II, págs. 345-346. (Bastardillas nuestras.)

Encuentro equivocado como metodología jurídica, especialmente en el campo penal, la noción que se expresa en el voto separado de que "El trecho resultaba muy corto—de exhibir a apuntar—para nosotros, y evidentemente para el Juez que vio y oyó la prueba también." El pensamiento detrás de esa expresión, pensamiento que en dicho párrafo se dejó inconcluso, parece indicar que debido a esa cortedad del trecho de exhibir a apuntar podemos *presumir* que apuntó. Siguiendo esa línea de pensamiento, más corto es el trecho de apuntar a disparar. ¿Acaso podemos también presumir que disparó? Enviar un hombre a la cárcel porque el trecho es muy corto entre exhibir y apuntar es para mí algo inaudito. Como se sabe, en derecho penal la *presunción* es la inocencia y no la culpabilidad del acusado.

En esencia, la posición mayoritaria consiste en descansar en la forma en que el juez de instancia dirimió el conflicto de la prueba. Mi posición es que, a la luz de las circunstancias concurrentes en el caso, las cuales he descrito antes, el tribunal de instancia dirimió mal el conflicto de la prueba.

Ante los hechos de este caso no debe bastar, a mi juicio, descansar en lo que hizo el juez de instancia. *Cuando de hacer justicia se trata* y no meramente de resolver puntos abstrac-

tos de derecho, tenemos el deber de aplicar con firmeza el bisturí de la razón al manto en que nos llega envuelto el caso—las conclusiones de toda índole del tribunal de instancia—y de abrirlo de par en par para poder así examinar sus entrañas. Sólo así puede hacerse justicia.

Hacer eso no es nada nuevo; los casos en que lo hemos hecho son legión: por ejemplo, en *Pueblo* v. *Aletriz*, 85 D.P.R. 646 (1962) (Pérez Pimentel) y en *Pueblo* v. *Serrano Nieves*, 93 D.P.R. 56 (1966) (Dávila), el Tribunal fue más allá de los errores señalados en apelación y examinó y pasó juicio sobre la prueba a los fines de hacer justicia. En ambos casos se revocó la sentencia apelada. Recientemente, en *Malavé* v. *Hospital de la Concepción*, 100 D.P.R. 55 (1971) (Martínez Muñoz), otra vez el Tribunal revocó basándose en que el juez de instancia apreció mal la prueba.

El Derecho es una disciplina normativa, tiende a lo que "debe ser." No es meramente una ciencia jurídica despreocupada. Frente a las angosturas del mero formalismo cabe oponer el contenido humano y ético que lo informa. Las circunstancias todas de este caso constituyen el *substratum* del mismo. Por eso, para resolverlo en sus verdaderos méritos es necesario, creo, verlo en su conjunto. Sin malicia para nadie, con respeto para todos, eso, según Dios me permite verlo, es lo que creo.

—O—

Voto separado del Juez Asociado Señor Martínez Muñoz con el cual están conformes los Jueces Asociados Señores Pérez Pimentel, Dávila y Ramírez Bages.

San Juan, Puerto Rico, a 9 de marzo de 1972

He votado para que se confirme la sentencia objeto de este recurso. Estoy convencido que en el proceso contra el apelante se observaron escrupulosamente las normas que demanda el debido procedimiento de ley. Un examen minucioso del récord

de este caso debe convencer al más exigente que no se impone otro resultado en este recurso que la confirmación de la sentencia propuesta en la opinión del Tribunal.

Estoy de acuerdo con mi compañero juez que la ley nos autoriza a entender, con el más alto fin de justicia, en todos los hechos y tramitaciones en la causa; y que para situar este caso en su *perspectiva real* (siguiendo sus palabras) es necesario que se considere la situación factual que sirve de trasfondo a los hechos criminales en este caso. Me refiero a los hechos según surgen del expediente del caso *Aponte Martínez* v. *Lugo,* resuelto en 29 de noviembre de 1971, 100 D.P.R. 282. Considero un exceso de mis facultades como juzgador utilizar otros que, como algunos de los que utiliza la disidencia, no surgen de los autos. Más adelante haré referencia a ellos. Los más elementales principios de justicia, la inherente condición de abstención que conlleva el cargo de juez y la propia ley al autorizarme a entender en todos los hechos, . . . *tal como aparecieren en autos,* así nos lo exige. (¹)

La prueba que tuvo ante sí el juzgador fue conflictiva sólo en cuanto al extremo de si el apelante apuntó con un revólver hacia la persona del testigo de cargo. Sobre los demás factores no hay discrepancia. Durante el contrainterrogatorio el Ministerio Público logró establecer que el apelante sacó el revólver; que el revólver estaba cargado con cinco balas (Vol. I, T.E. pág. 358) : que puso el revólver sobre la mesa; que le entregó ciertos documentos al testigo de cargo y

---

(¹) La Ley del 12 de marzo de 1903, 4 L.P.R.A. sec. 36, lee así:

"El Tribunal Supremo de Puerto Rico constituirá de aquí en adelante un tribunal de apelación y no un tribunal de casación. En sus deliberaciones y fallos en todos los asuntos, tanto en lo civil como en lo criminal, dicho Tribunal no se limitará solamente a infracciones de ley o quebrantamientos de forma, según se hiciera constar en sus exposiciones y excepciones sino que con el más alto fin de justicia, el Tribunal puede también entender en todos los hechos y tramitaciones en la causa *tal como aparecieren en autos,* considerando en igual forma sus méritos para la mejor administración de justicia y del derecho, y evitar injusticias y demoras." (Bastardillas nuestras.)

le dijo a éste que "hiciera el favor y se saliera de mi casa." Esto logró establecerse mediante la confrontación al apelante con su declaración anterior prestada, también en contrainterrogatorio, en la acción sobre *injunction* y sentencia declaratoria tramitada en el Tribunal Superior (Vol. IV, T.E. pág. 88—Caso Civil Núm. 67-4447):

"P. No se lo pregunta. ¿Es correcto lo que declaró en esa vista 'pongo el maletín sobre la mesa entonces dentro del maletín hay un revólver. Pongo el revólver sobre la mesa y le entrego los documentos y le digo que hiciera el favor y se saliera de mi casa'.
R. *Sí, señor yo declaré eso.*" (Bastardillas nuestras.)

En cuanto al delito imputado, el único elemento del mismo negado por el apelante fue que apuntara con el revólver al testigo de cargo. El magistrado dirimió el conflicto en contra del apelante. El apelante no impugna esa apreciación del juez sentenciador. La disidencia, sin embargo, asume la posición que el tribunal de instancia dirimió mal ese conflicto de prueba.

Para llegar a dicha conclusión, la disidencia señala que ante un juzgador imparcial el testimonio del testigo de cargo, bien pudo haber estado sujeto a duda razonable, lo que unido al carácter conflictivo de la prueba, debió desembocar en una sentencia absolutoria, dejando expresado su criterio, a mi juicio injustificado, que en este caso "el debido procedimiento de ley se observó *pro forma* solamente", y en el desprevenido, la impresión que todo este asunto no ha sido otra cosa que el resultado de un aborrecible complot o confabulación para aniquilar al apelante por su osadía en atentar contra supuestos derechos de la parte adversa en el caso civil.

I

La disidencia lanza dudas sobre la credibilidad del testigo. Lo atribuye a que éste desempeñaba tres roles distintos todos adversos al acusado. El primero, a su condición de abogado en el caso civil (*Aponte Martínez* v. *Lugo*, ante). El segundo

porque dicho testigo era a la vez denunciante en el caso criminal (objeto de este recurso). Y el tercero, porque el testigo era denunciante en un procedimiento sobre caución juratoria iniciada contra el acusado.

Su rol de abogado. No creo en privilegios. Huelga decir que no se han reclamado aquí. No es necesario resumir aquí las declaraciones que obran en el expediente de este caso. Tampoco tenemos el propósito de volver hacia atrás y referirnos a la prueba que desfiló en el caso civil. Basta señalar, como se apunta en la opinión mayoritaria, que fue precisamente debido a las relaciones del testigo de cargo como abogado en dicho caso que surgieron los hechos criminales en éste. En aquél un tribunal adjudicó la controversia entre las partes en relación con el despido del apelante y dictó sentencia apoyada en determinaciones de hecho que formuló basadas en prueba testifical y documental. Este Tribunal por el voto unánime de los jueces que intervinieron confirmó dicha sentencia. Las conclusiones hablan por sí solas.

La credibilidad del testigo no debe quedar afectada por el hecho de que actuara como abogado en ese caso. La norma de apreciación utilizada por la voz disidente, de prevalecer, pondría una severa e injusta restricción contra una clase, el abogado, quien en particular viene obligado a poner en conocimiento todo acto delictivo que ante él se cometiera. El abogado no tiene ni debe exigir ningún privilegio como testigo excepto en cuanto a materias que por ley son privilegiadas. Tampoco es justo una norma que equivale a una camisa de fuerza en el ejercicio de sus derechos como persona, como ciudadano y como abogado. Mi fe en la integridad de los jueces en nuestro país me compele a rechazar la idea de que puedan resultar incapaces de seguir los dictados de una sana y juiciosa crítica en su misión de desentrañar la verdad por el hecho de que en la escena del proceso estén presentes abogados denunciantes y la prueba sea conflictiva.

La declaración del testigo de cargo fue ratificada prácticamente en todas sus partes por el apelante. En esta apelación no es el apelante, sino la opinión disidente, la que impugna la credibilidad del testigo. Un examen de la transcripción de evidencia en el caso civil—utilizado por la opinión disidente para situar el presente en su *perspectiva real*—demostrará que sobre un importante aspecto el apelante, entonces demandado, corroboró en parte lo declarado por el abogado. Según las conclusiones en aquella sentencia, el allí demandado había solicitado de la otra parte que se le pagase la suma de $89,000, más siete pasajes de avión para Hawaii—todo ello como precio para él no llevar a cabo sus amenazas— (Caso Civil Núm. 67-4447, Conclusión de Hecho Núm. V). El allí demandado declaró que lo que él le dijo al abogado fue *"en forma de broma"*: "dile a Monseñor que me *mande algo* para dar un viaje, pero no mencioné nunca pasajes para Hawaii."

HON. JUEZ·
P. La *broma* fue que le dieran cuántos pasajes?
R. Que me diera un pasaje para dar un viaje, no mencioné cantidad de pasajes.
P. No dijo cuántos?
R. No, señor." (Bastardillas nuestras.) (T.E., Vol. II, pág. 346, Caso 67-4447.)

Para nosotros resulta sumamente extraño, de muy dudosa credibilidad, esa explicación viniendo de una persona que sostuvo que el único fin que perseguía con la publicación de la carta-informe era inspirado por su deseo como católico, apostólico y romano de cooperar a la mejor administración de los fondos del arzobispado.

Por supuesto, el juez sentenciador en el caso que ahora consideramos no tenía ante sí esa prueba. Como tampoco le fue presentada—seguramente por no considerarse relevante a los hechos en sí del acto delictivo imputado—prueba al efecto de que el acusado había declarado en el caso civil an-

terior que si lo complacían en cualquiera de las tres alternativas que ofrecía evitaría el escándalo. Una de esas alternativas consistía en una indemnización—"daños justos y razonables"—a la cual creía tener derecho.

"R. Yo no he dicho que voy a ir al escándalo. Yo lo quiero evitar. Yo soy que lo quiero evitar.

P. ¿Y en qué forma se hubiera evitado?

R. Dando una explicación, como le explico, o reponiéndome a mi trabajo.

P. ¿Qué más?

R. O *pagándome unos daños* justos y razonables, a los cuales creo que tengo derecho.

P. ¿*Una indemnización*?

R. *Correcto*.

P. En otras palabras, ¿que si lo complacían en cualquiera de esas tres alternativas, no había escándalo, porque usted no publicaba eso?

R. *Podría entenderse así.*" (Bastardillas nuestras.) (T.E., Vol. IV, págs. 52–53, caso civil.)

El único propósito—conclusión de aquel tribunal en el caso civil—que tenía el demandado era "presionar al demandante con la amenaza de hacer circular o publicar la carta si no recibía la indemnización pecuniaria que reclamaba", desinflándose así lo alegado por el demandado.

Conocido ya su verdadero propósito de obtener una indemnización pecuniaria, no resulta extraña la actuación del apelante, según lo revela la prueba en éste, de exhibir un arma mortífera, cargada con cinco balas, colocándola sobre una mesa alrededor de la cual se llevan a cabo unas conversaciones sobre una posible transacción, mediante el pago de una suma de dinero.

El trecho resulta muy corto—de exhibir a apuntar—para nosotros, y evidentemente para el juez que vio y oyó la prueba también, particularmente cuando la exhibición del revólver va seguida de la orden: *haga el favor de salirse de mi casa.*

La opinión disidente pone en duda la credibilidad del testigo de cargo por su rol como denunciante en una denuncia sobre caución juratoria contra el acusado. De los autos no surge eso. Tampoco sabemos el alcance y naturaleza del testimonio de los testigos de reputación vertidos, según se afirma, en el caso de caución. No puede aparecer en los autos. Es que para la fecha en que, según dicha opinión, se presentó dicha denuncia—4 de noviembre de 1968—ya habían transcurrido casi cinco meses de concluido el juicio, la presentación de la prueba, haberse aquilatado ésta y encontrado culpable y convicto al apelante del delito imputado. Eso fue el 26 de junio de 1968. Las manifestaciones del convicto el día 7 de noviembre de 1968 fueron proferidas durante el acto del pronunciamiento de la sentencia, a invitación del juez, siguiendo la costumbre en estos actos. Ya habían transcurrido casi cinco meses de habérsele declarado culpable y convicto del delito. Sus expresiones constituían en sí una acusación de haber sido perseguido injustificadamente. No fueron vertidas bajo juramento ni estaban sujetas a examen mediante contrainterrogatorio por el Ministerio Público. Las manifestaciones de los convictos en esa etapa sirven como una válvula de escape donde ellos le dan rienda suelta a la emoción, niegan el crimen —casi nunca lo admiten—e imploran la clemencia del juez en la imposición de la pena.

## II

Se apunta en la opinión disidente que el padre del testigo de cargo no declaró en el juicio. Se afirma que pudo haber declarado sobre todo lo que allí vio y oyó y que también, como parte del *res gestae,* pudo haber declarado sobre las manifestaciones del testigo de cargo alegadamente hechas inmediatamente después de los hechos.

Evidentemente esta referencia al padre del testigo de cargo tiene el propósito de señalar que el Ministerio Público

suprimió evidencia que estaba a su disposición para fortalecer el testimonio del testigo de cargo.

No hay tal cosa. Este no es el tipo de caso que se requiera prueba de corroboración. Regla 154 de Procedimiento Criminal. Además, el récord revela que el padre del denunciante no se encontraba presente en el lugar en que ocurrieron los hechos. Fue a solicitud del propio apelante que se retiró del comedor donde se encontraba, retirándose al balcón.

El testimonio del padre del denunciante no fue suprimido por el Ministerio Público. Si algo puede decirse es que si medió supresión ésta partió, no del Ministerio Público, sino del apelante. De los autos originales del caso (Folio 19) surge que la defensa, dos meses antes de comenzar el juicio (en 27 de marzo de 1968) anunció que utilizaría como testigo suyo al padre del denunciante, gestionó y obtuvo que se expedieran citaciones dirigidas a él para su comparecencia al juicio, y luego no lo utilizó.

Ni en el tribunal sentenciador, ni ante nosotros, la parte apelante planteó la cuestión que ahora se señala. Me parece oportuno recordar que en *Pueblo* v. *Torres González,* 86 D.P.R. 252, 255 (1962) este Tribunal, con el voto del autor de la disidencia, estableció la siguiente norma:

". . . [y] en *Viera v. Arizmendi,* 74 D.P.R. 38 (1952) resolvimos que el hecho de que una persona no declarara como testigo de una parte no levanta inferencia o presunción alguna contra ésta si nunca estuvo en corte como testigo ni fue ofrecida formalmente como tal. Examínense además: *People v. Williams,* 344 P.2d 45 (Calif. 1959); *People v. Herrera,* 340 P.2d 690 (Calif. 1959); Nota, *Evidence: Inference From the Failure to Produce Evidence,* 30 Calif. L. Rev. 79 (1941). Ahora, aparte de lo expuesto, la realidad es que la presunción que establece la Ley de Evidencia es una controvertible. Es al juez de instancia a quien debe planteársele la cuestión de que se ha suprimido el testimonio de un testigo y la presunción que ello conlleva. Entonces la otra parte tendría la oportunidad de controvertir la presunción explicando la razón por la cual no presentó al testigo. 'La presunción que se levanta de la supresión voluntaria de evidencia es contro-

vertible mediante otra evidencia.' *Pueblo v. Ramírez,* 50 D.P.R. 234, 259 (1936) y *Pueblo v. Saldaña,* 40 D.P.R. 580 (1930). Luego el juez al aquilatar la prueba presentada tomará en consideración todas las circunstancias presentes al dictar sentencia. Al juez de instancia no se le planteó esta cuestión. Es en apelación que por primera vez se apunta."