282

Asociados, Señores Hernández Matos y Torres Rigual, no intervinieron.

ARZOBISPO LUIS APONTE MARTÍNEZ, demandante y apelado, v. JOSÉ LUIS LUGO, demandado y apelante.

*Número:* O-69-255     *Resuelto:* 29 de noviembre de 1971

*Raúl E. González Díaz* y *Raúl Torres González,* abogados del apelante; *González, Jr., González-Oliver, Blanco Lugo & Morán, Benicio Sánchez Castaño, Manuel García Cabrera, Luis R. Polo, Heriberto Torres Solá* y *William Feliciano,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Este caso es un vivo ejemplo de la sabia máxima que dice que el precio de la libertad es la eterna vigilancia.

Se trata de un caso de censura previa (*prior restraint*) ejercida mediante un interdicto judicial prohibiendo

la publicación de un escrito. Dicho interdicto es ilegal y nulo por constituir una violación de la libertad de palabra y de prensa garantizadas por la Constitución de Puerto Rico y por la Primera Enmienda de la Constitución de los Estados Unidos. También constituye dicho interdicto una violación a la "Ley Definiendo Derechos del Pueblo," de 27 de febrero de 1902. Más adelante nos referiremos a los mencionados textos constitucionales y legales y a la jurisprudencia normativa sobre los mismos.

Para fines de mayo de 1967 el Arzobispo Aponte Martínez contrató los servicios del recurrente, Sr. José Luis Lugo, como Administrador de los bienes de la Iglesia Católica en Puerto Rico. El sueldo acordado fue de $1,200.00 mensuales. El Administrador anterior, Sr. Bordonada, había renunciado. Los bienes de dicha Iglesia en Puerto Rico incluyen bienes inmuebles por valor de muchos millones de dólares y sumas considerables en efectivo. En cuanto a la administración de dichos bienes, existe o existía una serie de deficiencias, las cuales ya habían sido expuestas por el anterior Administrador, Bordonada, en un Informe suyo al Arzobispo.

Al hacerse cargo de esa administración y comenzar a trabajar en ella, Lugo señaló un número de irregularidades y problemas y los trajo a la atención del Arzobispo Aponte en una serie de conferencias que ellos celebraron. Estas conferencias culminaron en que el Arzobispo decidió prescindir de los servicios de Lugo y lo despidió.

Lugo creyó injustificado su despido y luego de varios días le dirigió al Arzobispo una carta-informe con fecha de 15 de agosto de 1967. Al fin de dicha carta Lugo le dice al Arzobispo que de no recibir contestación enviaría copia de la misma a los obispos de Puerto Rico, a la Nunciatura de Santo Domingo, al Vaticano, a los sacerdotes de la Isla, a las personas que tienen relación con determinados fondos y al Departamento de Justicia.

Para que Lugo no publicase su carta-informe es que el Arzobispo solicitó y obtuvo el interdicto que motivó este pleito. Lo que tenemos que determinar aquí es si el juez de instancia actuó correcta o equivocadamente al expedir el interdicto.

La Constitución de Puerto Rico dispone en la Sec. 4 de su Art. II que "No se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios."

La Sec. 3 de la Ley Definiendo Derechos del Pueblo, Leyes, 1902, pág. 297, 1 L.P.R.A. sec. 11, dispone que "No se coartará a nadie la libertad de la palabra, y toda persona tendrá entera libertad para hablar, escribir o publicar lo que le plazca sobre cualquier asunto, siendo responsable, sin embargo, de todo abuso en que incurra de esa libertad."

La Primera Enmienda a la Constitución de los Estados Unidos dispone, en lo pertinente, que el Congreso "no aprobará ninguna ley . . . que coarte la libertad de palabra o de prensa."

Ya en 1914, en *Pueblo* v. *García*, 21 D.P.R. 163, 165, *in fine*, dijimos que "la libertad de palabra está completamente garantida en Puerto Rico por virtud de la Sección 3 de una Ley Definiendo Derechos del Pueblo, aprobada en 27 de febrero de 1902" y señalamos que al resolver no podíamos perder de vista dicho precepto de ley "como tampoco el principio constitucional tan respetado siempre [de libertad de palabra y de prensa]." Desde luego, hoy día la libertad de expresión en Puerto Rico se asienta sobre bases más sólidas que un mero estatuto, pues, como se sabe, está garantizada por los antes citados preceptos constitucionales de las Constituciones de Puerto Rico y de los Estados Unidos.

En *Pueblo* v. *Lastra Charriez*, 50 D.P.R. 118, 129 (1936), por voz del entonces Juez Presidente Sr. Del Toro, expresamos: "El derecho a la crítica fuerte, alerta, severa, apasio-

nada aún, no puede ser restringido. Corresponde a los ciudadanos de un pueblo libre. Es suyo y nadie puede arrebatárselo. Sobre eso no hay duda alguna." En *Pueblo* v. *Burgos,* 75 D.P.R. 551, 570 (1953), señalamos que las libertades de palabra, de prensa y de reunión en asamblea "son vitales para la existencia misma de la democracia." Este Tribunal tiene a su haber haber reconocido a través de su existencia "la primacía de que goza la libertad de expresión" en nuestro orden constitucional. *Mari Bras* v. *Casañas,* 96 D.P.R. 15, 20 (1968).

■ No cabe duda de que el apelante puede invocar y ejercer ese derecho pues, independientemente del hecho de ser él ciudadano de Puerto Rico y de los Estados Unidos, es un residente de Puerto Rico. Los derechos de libertad de palabra y de prensa son derechos humanos tan fundamentales, *Grosjean* v. *American Press Co.,* 297 U.S. 233, 244 (1936), que el ordenamiento constitucional de los Estados Unidos se los garantiza tanto a ciudadanos como a extranjeros. *Bridges* v. *Wixon,* 326 U.S. 135, 148 (1945). La Primera Enmienda no distingue entre ciudadanos y extranjeros y la Enmienda 14 prohíbe privar "a persona alguna" de los derechos que confiere. No limita sus beneficios únicamente a los ciudadanos.

■ Igual ocurre en Puerto Rico. Nuestra Constitución no limita la libertad de palabra y de prensa únicamente a los ciudadanos y la Sec. 7 del Art. II, sección que es en gran medida equivalente a la Enmienda 14 norteamericana, reconoce como derecho fundamental del "ser humano," entre otros, el derecho a la libertad. Dicha sección también expresa que "ninguna persona" será privada de su libertad sin el debido proceso de ley. Esa libertad mencionada en dicha Sec. 7 comprende, aquí como en los Estados Unidos, entre otras, la libertad de palabra y de prensa.

Como hemos expresado antes, las garantías de nuestra Carta de Derechos las interpretamos y hacemos efectivas "no en menor grado de protección" que lo hace, respecto a garan-

tías similares, el Tribunal Supremo de los Estados Unidos. *R.C.A.* v. *Gobierno de la Capital,* 91 D.P.R. 416, 427 (1964).

■ No cabe duda de que las garantías de la citada Ley de 1902 y de la Constitución de Puerto Rico le aplican al apelante en la forma más directa posible. Por otro lado, las garantías de la Primera Enmienda de la Constitución de los Estados Unidos también le aplican por lo siguiente. Esas libertades garantizadas por la Primera Enmienda son parte de la libertad protegida por la cláusula de debido procedimiento de ley de la Enmienda 14 de dicha Constitución. *Schneider* v. *State,* 308 U.S. 147, 160 (1939); *Lovell* v. *Griffin,* 303 U.S. 444, 450 (1938); *De Jonge* v. *Oregon,* 299 U.S. 353, 364 (1937); *Grosjean* v. *American Press Co.,* 297 U.S. 233, 244 (1936); *Near* v. *Minnesota,* 283 U.S. 697, 707 (1931).

■ Nosotros, siguiendo la antes mencionada política judicial que expresamos en *R.C.A.* v. *Gobierno de la Capital,* supra, hacemos efectiva en Puerto Rico, en lo aplicable, las garantías de la Primera Enmienda que están protegidas en los estados federados por la Enmienda 14. Además de que lo hacemos así por convicción propia, sería iluso pensar que el Tribunal Supremo de los Estados Unidos no insistiría en que se protegiesen en Puerto Rico los derechos constitucionales fundamentales de los ciudadanos de los Estados Unidos. El apelante, como antes señalamos, es ciudadano de los Estados Unidos. También, el derecho a la libre expresión es uno de los derechos fundamentales que a tenor con la Ley de Relaciones Federales con Puerto Rico se respetarán en este país hasta el mismo grado que si Puerto Rico fuese un estado federado de la Unión. 64 Stat. 319 (1950); Sec. 7, 61 Stat. 772 (1947).

■ El Tribunal Supremo de los Estados Unidos, en una serie de casos, ha rechazado y desacreditado las tentativas de censura previa, especialmente las que, como en el caso de autos, se han pretendido llevar a cabo mediante interdictos (*injunctions*). Probablemente los dos casos más notables de esa

serie son los de *Near* v. *Minnesota*, 283 U.S. 697 (1931) y el reciente caso de *New York Times Co.* v. *United States*, 403 U.S. 713 (1971). El primero, por el valor intrínseco de la opinión del Tribunal y por la eminencia de los jueces que la prohijaron, y el segundo por la importancia del asunto envuelto, ya que el gobierno invocó, aunque sin éxito, el casi siempre avasallador argumento de la seguridad militar nacional.

Esos dos importantes casos son aplicables al de autos porque, en su esencia, son iguales: en ambos se trató de prohibir de antemano mediante interdicto la publicación de material escrito.

En *Near*, supra, se obtuvo, como dijimos, un interdicto para prohibir la publicación de un escrito en un periódico por considerarse dicho material "malicioso, escandaloso y difamatorio." Del caso surge, que, en efecto, con toda probabilidad dicho material era malicioso, escandaloso y difamatorio. En una opinión extraordinaria, escrita por el entonces Juez Presidente Charles Evans Hughes, con los votos a favor, entre otros, de los Jueces Holmes, Brandeis y Stone, el Tribunal anuló el interdicto y permitió la publicación. Luego de señalar que lo que se trataba de hacer vía *injunction* constituía la esencia de "la censura previa" (283 U.S. a la pág. 713), el Tribunal recordó que el propósito principal de la garantía constitucional de libertad de prensa es precisamente prohibir esa clase de censura.

Señaló el Tribunal que el ejercicio de la libertad de palabra y de prensa no depende de que lo que se diga o publique sea cierto y que tampoco puede coartarse dicha libertad en aras de evitar un escándalo (283 U.S. a la pág. 721, *in fine* y pág. 722). Expresó que la libertad de prensa es esencial para la vida de un país libre y que esa libertad consiste en que no se le imponga censura previa a las publicaciones. 283 U.S. a la pág. 713.

En *Murdock* v. *Pennsylvania*, 319 U.S. 105, se trató de

suprimir la publicación de cierta literatura alegadamente mortificante sobre asuntos religiosos. El Tribunal expresó que no hay derecho a prohibir la publicación de ideas porque éstas sean impopulares, mortificantes o desagradables.

El Tribunal Supremo de los Estados Unidos ha sostenido en forma clara y terminante la libertad de palabra y de prensa y ha señalado que dichas libertades se garantizan y se garantizarán por los tribunales especialmente cuando se trata de suprimir publicaciones o ideas que en un momento dado resulten impopulares u odiosas. *Murdock* v. *Pennsylvania,* supra, y casos citados más adelante. Naturalmente, así tiene que ser. Difícilmente nadie ha de ser perseguido por repetir los lugares comunes de cada época. La protección constitucional tiene el propósito de proteger tanto la publicación de esos lugares comunes como la de ideas nuevas o minoritarias. Una sola conciencia que disienta tiene derecho a expresarse. Como la tradición del derecho constitucional norteamericano sobre este asunto es una tradición admirable, sería prolijo citar las muchas expresiones vigorosas y elocuentes del Tribunal Supremo de los Estados Unidos en defensa de la libertad de palabra y de prensa. Pueden verse, sin embargo, *Lovell* v. *Griffin,* 303 U.S. 444, 452; *Baumgartner* v. *United States,* 322 U.S. 665, 673–674; *New York Times* v. *Sullivan,* 376 U.S. 254, 269–271; *Cox* v. *Louisiana,* 379 U.S. 536, 551–552; *Carroll* v. *Princess Anne,* 393 U.S. 175, 180–181; *Organization for a Better Austin* v. *Keefe,* 402 U.S. 415.

En *New York Times Co.* v. *United States,* 403 U.S. 713, resuelto en 30 de junio de 1971, el Tribunal, luego de citar a *Near* v. *Minnesota,* supra, y otras autoridades, concluyó que el gobierno no había vencido la fuerte presunción de inconstitucionalidad de la censura previa que pretendía ejercer y sostuvo a un Tribunal de Distrito de Nueva York, al Tribunal de Distrito del Distrito de Columbia y al Tribunal de Apelaciones del Distrito de Columbia. El Tribunal no permitió la censura intentada por el Gobierno.

■ En *Burstyn* v. *Wilson,* 343 U.S. 495, se pretendió censurar una película titulada "The Miracle" a base de que era "sacrílega." El Tribunal, luego de recordar una vez más que el propósito principal de la Primera Enmienda es prohibir la censura previa resolvió que no procedía, por inconstitucional, la prohibición contra la exhibición de dicha película.

■ Desde luego, la libertad de expresión está sujeta a algunas excepciones, aunque éstas, a la luz de la más reciente jurisprudencia, cada vez son menos. El ejercicio de este derecho debe hacerse en forma moralmente .responsable. La convivencia civil y democrática presupone que no se abusará de los derechos. La jurisprudencia da por sentado que en tiempo de guerra no se permitiría publicar las fechas de salidas de barcos, el número y localización de las tropas, el *situs* de las instalaciones militares, etc. Puede asegurarse que el caso de autos no cae ni remotamente bajo los criterios que permitirían hacer de él una excepción a la prohibición constitucional contra la censura previa. En el caso de *New York Times Co.* v. *United States,* supra, resuelto en 30 de junio de 1971, el Tribunal Supremo ha reiterado explícitamente, citándolo lo que dijo en *Bantam Books Inc.* v. *Sullivan,* 372 U.S. 58, 70, en el sentido de que toda tentativa de censura previa llega al Tribunal acompañada de una fuerte presunción de inconstitucionalidad. El caso de autos en modo alguno rebate esa fuerte presunción.

En el *Informe de la Comisión de Carta de Derechos* a la Convención Constituyente de Puerto Rico se dejó claramente establecido que:

"Esta sección [la sección 4 de nuestra Carta de Derechos] corresponde a las restantes disposiciones de la enmienda primera en la Constitución federal *e incorpora a nuestra Constitución todo el derecho históricamente establecido con relación a la libertad de palabra, de prensa, de reunión y de petición.* Las secciones 3 y 4 cubren el ámbito general de la libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar

a plenitud dentro de la más dilatada libertad la totalidad de estos derechos."(¹) (Bastardillas nuestras.)

Esas palabras antes citadas están llenas de significado. Ese derecho histórico comprende no solamente la jurisprudencia de los tribunales de apelación de los Estados Unidos, como la antes citada, sino también la parte probablemente más valiosa de la historia política y constitucional de ese país desde su origen como colonias inglesas. Incluye además ese trasfondo histórico lo mejor del pensamiento y de la tradición constitucional occidental. Incluye, entre otros, los nombres de Sir Edward Coke, John Lock, Montesquieu, Rousseau, Jeremias Bentham, Alexis de Tocqueville, John Stuart Mill, James Madison, Thomas Jefferson, Oliver Wendell Holmes Jr., Louis Brandeis, Benjamin Cardozo, Earl Warren y William Douglas. (²)

Al discutirse la garantía constitucional de la libre expresión, en el excelente estudio *La Nueva Constitución de Puerto Rico*, ediciones de la Universidad de Puerto Rico, (1954) preparado por la Escuela de Administración Pública de esa Universidad, se expresa lo siguiente, a las págs. 206–207:

"Si éste es en principio un estado liberal, tiene que estar fundado sobre el reconocimiento de la libertad de los individuos a la libre expresión de su pensamiento; es decir, que no podrá el estado someter nunca esa libre expresión a decisiones previas y concretas del poder público. El sistema de censura previa para la autorización de publicaciones, practicado de modo normal y permanente por los regímenes absolutistas que precedieron a

---

(¹) *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, ed. Equity de 1961, Tomo 4, pág. 2564..

(²) Chaffe, *Free Speech in the United States* (1946); Corwin, *The Higher Law Background of American Constitutional Law*, Cornell Paperbacks (1965); Pound, *The Development of Constitutional Guarantees of Liberty* (1957); Ebenstein, *Great Political Thinkers*, 3ra. ed. (1963) (Hay traducción española, Ediciones de la Revista de Occidente, Madrid (1965) titulada *Los Grandes Pensadores Políticos*); McIlwain, *Constitutionalism, Ancient and Modern* (1940); Sabine, *A History of Political Theory* (1945) (Hay traducción española del Fondo de Cultura Económica, México (1970) titulada *Historia de la Teoría Política*).

la aparición del liberalismo, ya no es más admisible dentro de éste.

. . . . . . . .

[S]ólo es admisible dentro del régimen liberal la represión penal *a posteriori* de los delitos que puedan haberse cometido mediante la palabra oral o escrita en relación con el orden público o intereses morales de la comunidad . . . ."

Para una evaluación de nuestra Constitución y en especial de su Carta de Derechos véase el *Informe del Comité Para el Estudio de los Derechos Civiles en Puerto Rico,* editorial Colegio de Abogados de P.R. (1959) págs. 1–5 y también la publicación *Los Derechos de Expresión y el Uso de las Vías Públicas en Puerto Rico,* de la Comisión de Derechos Civiles de Puerto Rico (1971) págs. 1–4.

Uno de los errores señalados por el apelante es al efecto de que la resolución de 21 de agosto de 1967 decretando la orden de interdicto provisional y la sentencia de 28 de noviembre del mismo año declarando con lugar la solicitud de interdicto permanente, ambas del tribunal de instancia, constituyen violaciones al derecho de la libre expresión. Dicho error se cometió. Dichas resolución y sentencia constituyen un caso de censura previa que está en abierta pugna con los preceptos constitucionales, estatutarios y jurisprudenciales antes mencionados en esta opinión.

Otro de los errores señalados es en el sentido de que el tribunal de instancia aplicó erróneamente el caso de *Coll* v. *Biascoechea,* 52 D.P.R. 753 (1938). Independientemente y además de la realidad histórica de que el derecho constitucional ha progresado considerablemente en el área de los derechos humanos desde la fecha en que se falló ese caso, el mismo no es aplicable. Allí se trataba de una rencilla entre dos dentistas que tenían su consultorio en la misma calle, uno frente al otro. Se probó que uno de ellos destacaba personas frente a la oficina del otro con el fin de persuadir a los clientes de éste de que no entrasen a su oficina y de que concurriesen

a la suya. Allí se determinó que eso constituía un estorbo y se sostuvo un interdicto para prohibir la mencionada práctica.

Debe ser clara la diferencia entre ese caso de *Coll* y el de autos. En aquél estaban envueltos meramente unos intereses económicos privados. Por el contrario, en el caso de autos se trata de uno de los derechos humanos más fundamentales que garantizan todas las constituciones modernas: el derecho a libertad de palabra y de prensa.

■ Los argumentos del demandante-apelado en el sentido de que la publicación de la carta-informe de Lugo produciría escándalo no son válidos pues ya se ha resuelto que ese argumento no es válido para intervenir con la libertad de palabra y de prensa. *Near* v. *Minnesota*, supra, a las págs. 721–722. Dicha carta-informe trata de asuntos de interés público. Su publicación podría tener el saludable efecto de que se corrigiesen las cosas que necesitasen corrección. El propio Arzobispo admitió que muchas de las deficiencias que Lugo señaló existían. Lo hizo al declarar en relación con el informe del Administrador anterior, el Sr. Bordonada.

■ Tampoco tiene validez el argumento del demandante en el sentido de que dicha carta-informe viola su derecho a la privacidad. Como hemos visto por la jurisprudencia del Tribunal Supremo de los Estados Unidos antes citada, ese argumento no es suficiente para derrotar la libertad de palabra y de expresión. No lo es porque no se trata aquí de una persona privada sino de una persona pública. El Arzobispo es una figura pública en Puerto Rico. Organiza y dirige marchas en favor y en contra de legislación; celebra conferencias de prensa; se expresa públicamente sobre asuntos públicos, etc. Véanse, *Organization for a Better Austin* v. *Keefe*, 402 U.S. 415 (1971); y *Curtis Publishing Corp.* v. *Butts*, 388 U.S. 130 (1967).

Con buen sentido señala el Juez Presidente Warren, en su opinión concurrente en *Butts*, supra, a la pág. 164, que las figuras públicas (*public figures*) que no son funcionarios

oficiales (*public officials*) no están sujetas a la responsabilidad frente a un electorado—pues no son electas—y es por eso que es solamente la opinión pública la que puede a veces evitar que cometan excesos. Para ello es necesario que la opinión pública esté bien enterada mediante el libre ejercicio de la palabra y de la prensa en relación con ellas.

No podemos ser indiferentes ni débiles en la defensa de los derechos humanos—uno de los cuales es la libertad de expresión aquí envuelta—dada nuestra sociedad industrial contemporánea, que tantos peligros de represión va mostrando. En ésta, como en otras materias, una onza de prevención vale por un quintal de remedio. En la prevención generalmente gastamos sólo energía espiritual; el remedio, la historia nos enseña, se paga con el espíritu y con sangre. Recordemos la elocuente advertencia de Martín Niemoller, hecha en el año 1945:

"En Alemania, los nazis primero persiguieron a los comunistas, pero yo, como no era comunista, no protesté. Más tarde vinieron tras los judíos, pero como yo no era judío, no protesté. Luego, comenzaron a perseguir a los miembros de las uniones obreras, mas como yo no estaba unionado, no protesté. Más adelante la persecución se tornó contra los católicos, pero siendo yo protestante, no tuve por qué protestar. Luego vinieron por mí. Para entonces ya no había nadie que protestara por ninguno otro. Asegurémosno de que tal cosa no vuelva a suceder."

No creemos que para el hombre civilizado la libertad de conciencia es menos importante que la libertad física. Si aquí se tratase de la encarcelación ilegal del apelante hubiésemos expedido un auto de *hábeas corpus*. Por tratarse de la mordaza de una conciencia creemos que se le debe dar igual prioridad a este asunto.

*Se revocará la resolución de interdicto provisional dictada en este caso en 21 de agosto de 1967 por el Tribunal Superior, Sala de San Juan, y se modificará la sentencia dictada por dicho Tribunal en este mismo caso en 28 de noviembre de 1967, revocando la orden de interdicto permanente que prohibía al*

*apelante publicar su carta-informe (Exhibit 1 del deman-*
*dante) de 15 de agosto de 1967. Igualmente se revocará la*
*condena al demandado de honorarios de abogado del deman-*
*dante.*

El Juez Presidente, Señor Negrón Fernández y los Jueces
Asociados, Señores Hernández Matos y Martín, no intervi-
nieron.