LEOPOLDO HERNÁNDEZ ESTRELLA ET AL., recurridos, *v.* JUNTA DE APELACIONES DEL SISTEMA DE EDUCACIÓN PÚBLICA y el DEPARTAMENTO DE EDUCACIÓN, peticionarios.

*Número:* CC-97-437          *Resuelto:* 24 de marzo de 1999

---

842

*Ángel Raúl Pérez Muñiz*, del *Bufete Pérez-Muñiz & Santiago-Meléndez*, abogado de los recurridos; *Edda Serrano Blasini, Subprocuradora General*, y *Carmen A. Riera Cintrón, Procuradora General Auxiliar*, abogadas de los peticionarios.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

*El 5 de abril de 1996, Leopoldo Hernández Estrella, Carmen Vázquez De Jesús e Ileana Parés Rivera, maestros de la Escuela Ana Roque de Humacao, se ausentaron durante horas de clase de sus labores docentes y se trasladaron frente a la Escuela Petra Mercado, del mismo distrito escolar, para participar en un piquete.*

El piquete, realizado pacíficamente, fue organizado por un grupo de empleados docentes de la Escuela Petra Mercado. Tenía el propósito de repudiar la gestión administrativa de la directora de dicho plantel.

El 7 de abril el Secretario de Educación, mediante una comunicación escrita, les imputó conducta altamente repudiable, causa suficiente para destituirlos. No obstante, se limitó a amonestarlos y les notificó que dicha amonestación formaría parte de sus expedientes de personal. Varios

maestros del plantel, en el que se dio la protesta, también fueron sancionados.

El 26 de abril apelaron ante la Junta de Apelaciones del Sistema de Educación Pública (en adelante la J.A.S.E.P.). Solicitaron se dejara sin efecto la amonestación escrita, aduciendo que ello limitaba y coaccionaba a los empleados de dicha agencia en el ejercicio de su libertad de expresión y asociación. El 5 de junio, la J.A.S.E.P. acogió la recomendación del Oficial Examinador y confirmó la actuación del Secretario.[1]

Oportunamente, los maestros acudieron en revisión al Tribunal de Circuito de Apelaciones. El 30 de abril de 1997, dicho foro apelativo (Hons. Fiol Matta, Rodríguez de Oronoz y Gierbolini, Jueces) revocó. *Resolvió que la manifestación llevada a cabo no era del tipo huelgario y sí un ejercicio legítimo de la libertad de expresión sobre un asunto de preocupación pública, no de interés personal.* A la luz de *Velázquez Pagán v. A.M.A.*, 131 D.P.R. 568 (1992), y el balance de intereses allí establecido, sostuvo que procedía el descuento del salario de los días de ausencia, pero no la amonestación por escrito, por ser una medida disciplinaria prevista para la participación de maestros *en huelgas.* Aplicó, además, la norma penal prohibitoria de doble penalidad por una misma falta. A solicitud del Departamento de Educación, expedimos el *certiorari*.[2]

---

[1] El 3 de julio de 1996, la Junta de Apelaciones del Sistema de Educación Pública (en adelante la J.A.S.E.P.) declaró no ha lugar una reconsideración.

[2] Plantea:

"A. Erró el Hon. Tribunal de Circuito de Apelaciones al determinar que el piquete al que asistieron los aquí recurridos en horas laborables constituyó un ejercicio válido de la libertad de expresión, y que por lo tanto no procede la amonestación por escrito.

"B. Erró el Hon. Tribunal de Circuito de Apelaciones al determinar que aplica la norma contra la imposición de doble penalidad por una misma falta." Petición de *certiorari*, pág. 7.

## II

Dirimir la controversia de autos exige, de entrada, cualificar la actividad llevada acabo por los maestros. ¿Fue de tipo huelgario? ¿Está protegida por la libertad de expresión a la luz de la normativa vigente?

Los maestros sostienen, y así lo estimó el Tribunal de Circuito de Apelaciones, que su participación en un piquete frente a una escuela distinta a la de ellos, organizado por los maestros de ese plantel escolar, no era de tipo huelgario, sino un ejercicio de su libertad de expresión. Argumentan que en su plantel "no había ningún conflicto ni dilema en comparación con la Escuela Petra Mercado, donde sí existía un problema entre la facultad, padres, estudiantes y la directora". Apéndice, Anejo VII, pág. 44. Aducen que, aun cuando las labores docentes y lectivas se afectaran en dicho plantel, *el suyo no se afectó*. Exponen que su ausencia no deterioró la organización escolar.

En su sustrato, la posición de los maestros parte de la premisa de que cada plantel escolar es una entidad distinta e independiente de las demás, desconectada del sistema integral de educación pública. Sostienen que su interés en la manifestación no respondió a reclamos de índole laboral, pues en su plantel no existían divergencias laborales.

■ El Departamento de Educación constituye un sistema integrado dirigido por un Secretario, quien ejerce "todas las funciones ejecutivas, administrativas, operacionales, de supervisión y planificación de su Ley Orgánica". 3 L.P.R.A. sec. 391. Aunque se delega a los directores de cada escuela la autoridad y autonomía necesarias para realizar ciertas funciones y tomar las decisiones que correspondan para el buen funcionamiento de la escuela, *ello no desmembra al sistema, pues dicha autonomía administrativa está sujeta y tiene que ser cónsona con los parámetros de la ley orgánica*. Esta realidad jurídica y administrativa resta va-

lidez al planteamiento de los maestros de que por no haber problemas laborales en su escuela, la participación en el piquete de otro plantel escolar no era de naturaleza huelgaria. Por su pertinencia, es importante señalar que varios maestros de la Escuela Petra Mercado sancionados por los mismos hechos, en su solicitud de revisión al Tribunal de Circuito de Apelaciones,[3] admitieron que recurrieron al piquete porque el Departamento de Educación ignoraba sus reclamos contra la directora.[4] En efecto, era una protesta íntimamente relacionada con las condiciones de trabajo. Los maestros del caso de autos aceptan que el propósito del piquete fue repudiar la forma en que la directora administraba el plantel Petra Mercado y su relación con los empleados, maestros y estudiantes.[5] *Es forzoso concluir que el piquete llevado a cabo era de naturaleza laboral.* Además, al ellos ausentarse y abandonar sus labores docentes en la Escuela Ana Roque —distinto a su contención— *también* afectaron e interrumpieron las labores de dicho plantel; *en suma, afectaron las dos (2) escuelas.*

Las Secs. 17 y 18 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1 —rectoras del derecho de los empleados a organizarse y a negociar con sus patronos, así como a realizar huelgas, piquetes y cualquier otra actividad lícita— *excluyó de su cobertura a los empleados del Gobierno, sus agencias o instrumentalidades que no funcionan como empresas o negocios privados.* Véanse: 3 Diario de Sesiones de la Convención Constituyente 2574–2575 (1951); *Santos y otros v. Mun. de Comerío*, 142 D.P.R. 203 (1997); *J.R.T. v. Asoc. Servs. Médicos Hosp.*, 115 D.P.R. 360 (1984); *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437

---

[3] Casos Núms. KLRA9600378 y KLRA9600379.

[4] El Tribunal de Circuito de Apelaciones, el 18 de diciembre de 1996, confirmó la acción del Departamento de Educación.

[5] A esto se une el hecho de que luego del piquete, los manifestantes se trasladaron a las oficinas centrales del Departamento de Educación para, una vez más, exigir sus reclamos.

(1976). Por consiguiente, los maestros, como empleados del Departamento de Educación de Puerto Rico —agencia gubernamental que no funciona como empresa o negocio privado— *no tienen derecho a la huelga*, pues no están amparados por dicha disposición constitucional. Los constituyentes dejaron en manos de la Asamblea Legislativa establecer la forma en que iba a tratarse a estos empleados. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, T. III, págs. 199 *et seq*. Esta conclusión no dispone totalmente del recurso. Aun cuando hubiésemos coincidido con la tesis de los maestros, de que la actividad no fue de tipo huelgario, tampoco tendrían razón a base del alegato de que fue un ejercicio de su libertad de expresión. Veamos.

### III

Los maestros sostienen que la manifestación en la que participaron fue una protesta, en el ejercicio de su derecho constitucional a expresarse libremente sobre asuntos de interés público.

En *Velázquez Pagán v. A.M.A.*, supra, pág. 579, señalamos que aunque "no es permisible dentro de nuestro orden constitucional que un ciudadano tenga que renunciar al ejercicio de su derecho a la libre expresión, como condición a obtención de un empleo público" y que, en el ámbito del magisterio público, la libertad de palabra y de asociación también cobija a los maestros y estudiantes aun dentro del plantel, *Rodríguez v. Srio. de Instrucción*, 109 D.P.R. 251 (1979), tal derecho no era absoluto ni toda conducta está constitucionalmente protegida. Es preciso "sopesar el alcance de la restricción a la libre expresión y asociación, y la importancia del interés gubernamental que anima la restricción, a la luz de la amenaza que la conducta impedida representa para tal interés del Estado". *Mari Brás v. Casañas*, 96 D.P.R. 15, 21 (1968). Cuando la

conveniencia y necesidad públicas lo requieran, han de subordinarse a otros intereses. *Rodríguez v. Srio. de Instrucción*, supra, págs. 255–256; *Mari Brás v. Casañas*, supra.

▪ En *Velázquez Pagán v. A.M.A.*, supra, adoptamos la normativa federal ante reclamos de la libertad de expresión de empleados públicos. *Resolvimos que las expresiones de empleados públicos, resguardadas por la Constitución, son las concernientes a asuntos de preocupación pública: no las que sólo responden a intereses personales particulares.* De modo que, *primero*, como cuestión de derecho, debemos determinar si la expresión es sobre un asunto de interés público. De ser en la negativa, no se analizan las razones para la acción disciplinaria, ya que "[c]uando un empleado público se expresa, no como un *ciudadano* sobre asuntos de *interés público*, sino como un *empleado* sobre asuntos que son únicamente de *interés personal*" (énfasis y traducción nuestros), por lo general no está implicada la libertad de expresión. *Connick v. Myers*, 461 U.S. 138, 147 (1983). *Renfroe v. Kirkpatrick*, 722 F.2d 714 (11mo Cir. 1984); *Ballard v. Blount*, 581 F. Supp. 160 (N.D. Ga. 1983), *cert.* denegado, 105 S.Ct. 590 (1984). *Segundo*, de estar implicado un asunto de interés público, el empleado debe demostrar, como cuestión de hecho, que *su expresión fue un factor substancial en la decisión del patrono. Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486 (1990); *McCrillis v. Autoridad de Navieras de P.R.*, 123 D.P.R. 113 (1989); *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410 (1979); *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274 (1977). *Tercero*, de haber sido un factor substancial, es preciso analizar entonces si la *acción disciplinaria estuvo justificada y debe prevalecer.* En esa tarea es menester sopesar los intereses del empleado como ciudadano particular en expresarse libremente sobre dichos asuntos, y del Estado en promover la mejor eficiencia y productividad en el servicio de la educación pública. *Stroman v. Colleton County School Dist.*, 981 F.2d 152 (4to Cir. 1992); *Pickering*

*v. Board of Education*, 391 U.S. 563 (1968); *Maples v. Martin*, 858 F.2d 1546 (11mo Cir. 1988); *Ferrara v. Mills*, 781 F.2d 1508 (11mo Cir. 1986); *Connick v. Myers*, supra. *Finalmente*, al hacer el balance ha de considerarse la autoridad o el grado de responsabilidad del empleado en su lugar de trabajo. *Ranking v. McPherson*, 483 U.S. 378 (1987). Veamos.

## IV

■ La expresión sobre asuntos de *interés público*, protegida por la libertad de expresión, es la que atañe a asuntos de interés político, social o de otra índole para la comunidad —*Connick v. Myers*, supra, pág. 146— no asuntos vinculados a intereses propios y particulares del empleado. *Lewis v. Blackburn*, 734 F.2d 1000, 1012 (4to Cir. 1984). *No es de interés público*, "cuando la expresión versa sobre disputas y quejas individuales del personal, irrelevantes para la evaluación, por parte del público del desempeño de las agencias gubernamentales. Por otro lado, expresiones que tienen que ver con asuntos sobre los cuales la información es pertinente o necesaria para que los miembros de la sociedad tomen decisiones informadas sobre el funcionamiento de su gobierno, ameritan el más alto grado de protección conforme la [libertad de expresión]". (Traducción nuestra.) *Mckinley v. City of Eloy*, 705 F.2d 1110, 1114 (9no Cir. 1983). *Hall v. Ford*, 856 F.2d 255 (D.C. Cir. 1988).

> El principio dimanante es que toda expresión proveniente de un empleado público, cuyo contenido esté protegido por la libertad de expresión, tiene derecho, cuanto menos, a cierta protección cualificada contra acciones disuasivas del patrono, a excepción de las expresiones que, vistas de manera realista, son puramente de 'interés personal' ... El enfoque es, por lo tanto, si el 'público' o la 'comunidad' tiende a preocuparse o interesarse de verdad en la expresión particular, o si a ésta se considera más bien como un asunto esencialmente privado entre patrono

y empleado. (Citas omitidas y traducción nuestra.) *Berger v. Battaglia*, 779 F.2d 992, 998–999 (4to Cir. 1985).

■ Para determinar la naturaleza de la expresión, el Tribunal Supremo federal, en *Connick v. Myers*, supra, estableció la necesidad de inquirir, *caso a caso*, sobre su *contenido, forma* y *contexto*.([6]) Indicó, además, que si la expresión toca de alguna forma, aunque limitada, asuntos de interés público, debía considerarse protegida. Íd., pág. 154. *Maples v. Martin*, supra.

■ Similar al contenido de las expresiones en el caso ante nos, en *Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076 (4to Cir. 1987), se concibieron como de interés público las expresiones de una maestra sobre el desempeño del director de la escuela. Se señaló que era un asunto sobre el cual la comunidad, en la que ubicaba la escuela, tenía vital interés. *En el de autos, las manifestaciones en repudio a la forma en que la directora administraba el plantel escolar y sus relaciones con los maestros, padres y estudiantes, a la luz de la normativa y jurisprudencia antes expuesta, encie-*

---

([6]) Siguiendo esta pauta, los tribunales federales han emitido numerosas decisiones. Éstas reconocen interés público en las expresiones siguientes: crítica a las prácticas del pago de salarios, *Stroman v. Colleton County School Dist.*, 981 F.2d 152 (4to Cir. 1992); memorando para discutir métodos y criterios de evaluación, *Hesse v. Bd. of Educ. of Tp. High School Dist.*, 848 F.2d 748 (7mo Cir. 1988); quejas sobre la matrícula de cursos y sus asignaciones, *Ferrara v. Mills*, 781 F.2d 1508 (11mo Cir. 1986); expresión del maestro sobre su indisponibilidad a (*job share*), *Renfroe v. Kirkpatrick*, 722 F.2d 714 (11mo Cir. 1984); críticas a los niveles de salario, asignación de cursos, prontuarios de cursos propuestos y decisiones sobre permanencias (*tenure*), *Ballard v. Blount*, 581 F. Supp. 160 (D. Ga. 1983); *Hickman v. Valley Local Sch. Dist. Bd. of Ed.*, 619 F.2d 606 (6to Cir. 1980); *Givhan v. Western Line Consol. School Dist.*, 438 U.S. 410 (1979).

Otras han rechazado su naturaleza pública: cuestionar la forma de manejar el presupuesto de la escuela, *Stroman v. Colleton County School Dist.*, supra; alertar al público sobre las condiciones del Departamento de Educación, *Maples v. Martin*, 858 F.2d 1546 (11mo Cir. 1988); la política administrativa de una escuela de derecho y el tamaño de su población estudiantil, *Honore v. Douglas*, 833 F.2d 565 (5to Cir. 1987); la no implementación de un programa para estudiantes con impedimentos, *Southside Public School v. Hill*, 82 F.2d 270 (1987); estándares educativos y de acreditación, *Johnson v. Lincoln Univ. of Com.*, 776 F.2d 443 (3er Cir. 1985); expresión relacionada al salario, *Mckinley v. City of Eloy*, 705 F.2d 110 (9no Cir. 1983); crítica a la conducta del supervisor, *Collins v. Robinson*, 568 F. Supp. 1464 (D. Ark. 1983).

*rran aspectos de preocupación e interés público; sobre todo, para la comunidad en la que se encuentra dicho plantel.*

## V

■ Sin embargo, como hemos señalado, no es suficiente que la expresión sea de interés público y, por lo tanto, protegida por libertad de expresión. El empleado tiene que demostrar que la motivación o el factor substancial para tomar la acción disciplinaria fue, en efecto, dicha expresión. De lograrlo, entonces el Estado tiene la oportunidad de probar que hubiera llegado a la misma decisión (una sanción), ausente la expresión protegida. *Mt. Healthy City School v. Doyle*, supra.[7]

En este extremo, de la propia amonestación surge que la participación de los maestros en la manifestación de protesta frente a la Escuela Petra Mercado constituyó la única razón para la medida disciplinaria. Consignó que, por ausentarse de su plantel y abandonar sus responsabilidades académicas con el propósito de participar en el piquete,[8] se les amonestaba por escrito y unía a sus expedientes de personal. Concluimos, pues, que la expresión de los maestros a través del piquete fue el factor substancial para adoptar la acción disciplinaria.

---

[7] *Flath v. Garrison Public School Dist. No. 51*, 82 F.3d 244 (8vo Cir. 1996); *Gates v. Walker*, 865 F. Supp. 1222 (D. Miss. 1994); *Hatcher v. Board of Public Educ. and Orphanage*, 809 F.2d 1546 (11mo Cir. 1987); *McDonough v. Trustees of University System of N.H.*, 704 F.2d 780 (1er Cir. 1983); *Hickman v. Valley Local Sch. Dist. Bd. of Ed.*, supra; *Givhan v. Western Line Consol. School Dist.*, supra.

[8] Se define como "pequeño grupo de personas que exhibe pancartas con lemas, consignas políticas, peticiones, etc.". *Diccionario de la Lengua Española*, 21ra ed., Madrid, Ed. Espasa-Calpe, 1992. Por imperativo constitucional hemos reconocido la prerrogativa a realizar piquetes como parte del derecho a la libertad de expresión. Art. III, Sec. 18, Const. E.L.A., L.P.R.A., Tomo 1; *Morales Morales v. E.L.A.*, 126 D.P.R. 92 (1990); *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976); *Junta Rel. Trabajo v. Club Deportivo*, 84 D.P.R. 515 (1962). Aunque unido al reconocimiento de su valor intrínseco, hemos rechazado el reclamo de que sea absoluto, incapaz de subordinarse a otros intereses en circunstancias en que la convivencia y necesidad públicas así lo exijan. *Rodríguez v. Srio. de Instrucción*, 109 D.P.R. 251 (1979); *E.L.A. v. Rivera Rivera*, 105 D.P.R. 640 (1977); *A.A.A. v. Unión Empleados A.A.A.*, supra; *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975).

# VI

■ Ahora bien, una vez establecido que dichas expresiones —protegidas constitucionalmente por ser de interés público— fueron el factor substancial por lo cual se les amonestó, procede hacer un balance entre el interés de los maestros en expresarse y el del Estado en promover la mejor eficiencia y productividad del servicio público a través de sus empleados. "La interrogante de si las expresiones de un empleado están protegidas constitucionalmente es un asunto diferente al de la interrogante fundamental de si el patrono ha violado el derecho del empleado a la libertad de expresión." (Traducción nuestra.) *Ferrara v. Mills*, supra, pág. 1513. *Berry v. Bailey*, 726 F.2d 670 (11mo Cir. 1984).

En *Pickering v. Board of Education*, supra, pág. 568, el Tribunal Supremo federal expresó que "en cualquier caso, el problema consiste en lograr un balance entre los intereses de los maestros, como ciudadanos, al comentar sobre asuntos de interés público, y los intereses del Estado, como patrono, al promover la eficiencia de los servicios públicos que brinda a través de sus empleados". (Traducción nuestra.) Aunque este balance se ha de aplicar caso a caso, el Tribunal Supremo federal ha mencionado varios factores que se han de considerar: *el tiempo, el lugar, la manera y el contexto de la expresión; el efecto en la autoridad disciplinaria de los superiores, en la armonía laboral, en el desempeño eficiente de los deberes del empleado, y si interfiere con las operaciones regulares y normales de la institución. Maples v. Martin*, supra; *Ranking v. McPherson*, supra; *Eiland v. City of Montgomery*, 797 F.2d 953 (11mo Cir. 1986), *cert.* denegado, 107 S.Ct. 3263 (1987). En *Pickering v. Board of Education*, supra, al dar varios ejemplos de instancias en las que el interés del empleado en expresarse con libertad sobre asuntos públicos cede ante el interés del Estado en descargar eficientemente sus responsabilidades,

el Alto Foro federal *indicó que el interés del Estado debe prevalecer cuando la expresión del empleado afecta su desempeño en el trabajo, la armonía de sus compañeros o de otra forma impide las operaciones normales de la institución.*[9] En *Fergunson v. Thomas*, 430 F.2d 852, 859 (5to Cir. 1970), el Tribunal federal expresó que el patrono no tiene "derecho a controlar las expresiones [del maestro] o restringir su libertad de asociación, pero sí el derecho de dar por terminado su empleo en el momento en que el ejercicio de sus privilegios constitucionales claramente pese más que su utilidad". (Traducción nuestra.) *"La educación pública es reconocida como uno de los servicios públicos más importantes ofrecidos por el Estado y el mantenimiento de maestros profesionales y dedicados para proveer dicho servicio, un interés de los de más alto rango."* (Traducción y énfasis nuestros.) *Stroman v. Colleton County School Dist.*, supra, pág. 158.

## VII

Los maestros Hernández Estrella, Vázquez De Jesús y Parés Rivera se ausentaron de su lugar de trabajo —Escuela Ana Roque— para participar en un piquete frente a la Escuela Petra Mercado, *en solidaridad con los maestros y estudiantes de dicho plantel.* Al contrastar su interés en *repudiar el modo en el que la directora* conducía las actividades administrativas y las relaciones entre los empleados y directivos en dicho plantel —asunto de interés público— con el interés del Estado, concluimos que la sanción impuéstale estuvo *justificada y fue razonable. La actividad no podía realizarse durante horas laborables.* Con su con-

---

[9] *Derrickson v. Board of Educ. of City of St. Louis*, 738 F.2d 351 (8vo Cir. 1984); *Connick v. Myers*, supra; *Lusk v. Estes*, 361 F. Supp. 653 (D. Tex. 1973); *Adock v. Board of Ed. of San Diego Unified Sch. Dist.*, 513 P.2d 900 (Cal. 1973); *Duke v. North Texas State University*, 469 F.2d 726 829 (5to Cir. 1972); *Moore v. Winfield City Board of Education*, 452 F.2d 726 (5to Cir. 1971); *Yuen v. Board of Education of School Dist. No. U-46*, 222 N.E.2d 570 (1966).

ducta ese día, alteraron las tareas y actividades escolares que, como maestros, debían ofrecer en *ambas* escuelas. Ciertamente afectaron la enseñanza que debían recibir los estudiantes que acudieron a sus salones de clases. En las agencias e instrumentalidades públicas, la responsabilidad del empleado es directa e indeclinable para con la ciudadanía; detener los servicios que ofrecen, es paralizar *pro tempore* el cumplimiento de esas responsabilidades.

■ El Art. 3 de la Ley Núm. 115 de 30 de junio de 1965 (18 L.P.R.A. sec. 274-2)([10]) impuso como deberes magisteriales del sistema de educación pública, entre otros y en lo pertinente:

> ... [a]sistir al trabajo con regularidad y puntualidad, y cumplir la jornada de trabajo establecida[;] ... [r]ealizar eficientemente y con diligencia las tareas y funciones asignadas a su puesto y otras compatibles con las que se le asignen[,] ... [y c]umplir con las disposiciones de las leyes y reglamentos aplicables al Depto. de Educación y con las órdenes emitidas en virtud de las mismas.

■ Por su parte, la ley orgánica del Departamento expresa que "[l]a función principal del maestro ... es impartir la enseñanza ... preparar a los alumnos para que alcancen el máximo desarrollo intelectual, moral y social, dentro del marco de sus aspiraciones y responsabilidades". Art. 2.05 de la Ley Núm. 68 de 28 de agosto de 1990 (3 L.P.R.A. sec. 393). Además, autorizó al Departamento a tomar las medidas necesarias para asegurar la mayor calidad en la práctica profesional del personal docente. Como corolario, la Sec. 3 de la Ley Núm. 78 de 28 de agosto de 1991 (18 L.P.R.A. sec. 274-1)([11]) provee las medidas correctivas y el procedimiento que se ha de seguir por el Secretario ante violaciones del reglamento del personal docente

---

([10]) Según enmendado por la Ley Núm. 78 de 28 de agosto de 1991 (18 L.P.R.A. sec. 274 *et seq.*).

([11]) Enmendatoria de la Ley Núm. 115 de 30 de junio de 1965 (18 L.P.R.A. secs. 274–274o, 217, 245–246 y 271–272).

o la ley orgánica: amonestación verbal, *reprimendas escritas*, suspensión de empleo y sueldo y destitución.

*Fuera de horas laborables, sin ausentarse ni abandonar sus responsabilidades, los maestros tienen a su disposición una gran variedad de medios para protestar y manifestar su repudio a prácticas administrativas; de nuevo, sin alterar o menoscabar el servicio para el cual fueron empleados: la enseñanza pública, primordial e importante encomienda.*

## VIII

Como fundamento adicional, el Tribunal de Circuito de Apelaciones también concluyó que la sanción impuesta —una amonestación escrita— no procedía, toda vez que los maestros recibieron el descuento de su salario por el día en que se ausentaron. Adujo, que aplicaba la norma del ordenamiento criminal, prohibitoria de doble penalidad por la misma falta. *Incidió.*

Aunque en principio podemos aplicar normas de derecho penal a los procedimientos administrativos —cumpliendo claro está, con los criterios expuestos jurisprudencialmente—(12) los hechos ante nos no revelan una cuestión de doble pena por una sola conducta. La única pena impuesta fue la amonestación escrita. *El descuento del sueldo no obedeció a esa conducta ilegal, contraria al* reglamento de los maestros, sino al hecho de que no prestaron los servicios por los cuales reciben una paga.

*Se dictará sentencia revocatoria.*

El Juez Asociado Señor Hernández Denton disintió por entender que se debía confirmar la sentencia del Tribunal

---

(12) Se analizan los fundamentos y propósitos de la norma a aplicar así como el propósito y las consecuencias del proceso administrativo al cual se quiere aplicar la norma penal. Si la norma cumple los mismos fines en el proceso administrativo y no ocasiona descalabro, procede su aplicación. *Pagán Hernández v. U.P.R.*, 107 D.P.R. 720 (1978).

de Circuito de Apelaciones. Considera que dicho foro correctamente resolvió que procedía el descuento salarial por los días de ausencia, pero no la amonestación escrita. La imposición de una segunda medida disciplinaria esencialmente constituye una sanción irrazonable por el ejercicio legítimo de la libertad de expresión. El Juez Asociado Señor Fuster Berlingeri emitió una opinión disidente.

— O —

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri.

En el caso de autos los recurridos, maestros de una escuela pública, se ausentaron de sus labores docentes para participar en un piquete de protesta que padres, estudiantes y maestros de otra escuela organizaron para repudiar la manera en que la directora administraba dicha escuela. La protesta fue realizada durante horas de un día, de forma pacífica, en lugares públicos propios para este tipo de actividad.

Por razón de la conducta referida, a los maestros recurridos se les hizo *un descuento salarial* por el día que se ausentaron de sus labores docentes. Además, el Secretario de Educación (en adelante el Secretario) les notificó *una amonestación escrita* —que se hizo formar parte de sus expedientes de personal— en la cual le indicaba expresamente a cada maestro que su participación en el piquete de protesta no sólo constituía "un abandono de servicio", sino que, además, constituía *"una crasa violación"* a varias disposiciones legales; por lo que el maestro había incurrido, entre otras, en la siguiente conducta flagrante:

(1) conducta desordenada, incorrecta o lesiva al buen nombre del Sistema de Educación Pública;
(2) prevaricación, insubordinación, soborno o conducta inmoral.

El Secretario también determinó en dicha amonestación que la conducta de cada maestro referido era "altamente repudiable y constituye causa suficiente para su destitución". Le expresaba asimismo el "más enérgico repudio" a la conducta referida, y advertía que si el maestro volvía a incurrir en tal conducta, se tomarían "medidas más severas en su contra".

La mayoría del Tribunal determina que la doble sanción que el Secretario le impuso a cada uno de estos maestros —el descuento salarial y la amonestación escrita— estuvo justificada y fue razonable. Disiento de este dictamen.

## I

Estoy conforme con lo dispuesto por la mayoría respecto al *descuento salarial*. No cabe duda de que los maestros recurridos se ausentaron por un día de sus labores docentes, por lo que no tenían derecho a recibir paga por servicios que no prestaron.

También estimo que el Secretario podía escribirle a estos maestros, para indicarles que en la ocasión referida no habían cumplido con su deber de observar los horarios de trabajo, y advertirles que otras ausencias futuras conllevarían sanciones más severas. Ciertamente, las ausencias frecuentes no autorizadas o un patrón de abandono de las labores son causa suficiente para la destitución del empleado público. *Rodrigo v. Tribunal Superior*, 101 D.P.R. 151 (1973); *Lebrón v. Junta de Personal*, 100 D.P.R. 164 (1971).

Lo que el Secretario no podía hacer era reprochar a los maestros por la naturaleza de la actividad realizada por éstos ni repudiarla oficialmente en los términos en que lo hizo. Para todos los efectos, el Secretario determinó que era ilícita no sólo la ausencia del trabajo, sino el mismo piquete de protesta en el cual los maestros participaron. Tal proceder del Secretario, realizado en su carácter oficial

como tal, y con un evidente propósito y efecto intimidante, constituyó una actuación gravemente impropia por atentar contra los derechos de expresión garantizados por la Constitución del Estado Libre Asociado de Puerto Rico. Veamos.

## II

Como hemos señalado antes, nuestra Constitución consagra en forma inequívoca la primacía que goza en nuestro país la libertad de expresión y el derecho del pueblo a reunirse en asamblea pacífica y a pedir al Gobierno la reparación de agravios. *Mari Brás v. Casañas*, 96 D.P.R. 15 (1968). En la Asamblea Constituyente se consignó de modo diáfano que la disposición constitucional sobre la libertad de conciencia, de pensamiento y de expresión garantizaba *"ejercitar a plenitud dentro de la más dilatada libertad la totalidad de estos derechos"*. (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2564 (1952). Como reiteráramos en *Aponte Martínez v. Lugo*, 100 D.P.R. 282, 285 (1971), citando a *Pueblo v. Lastra Charriez*, 50 D.P.R. 118, 129 (1936), "[e]l derecho a la crítica fuerte, alerta, severa, apasionada aún, no puede ser restringido. Corresponde a los ciudadanos de un pueblo libre. Es suyo y nadie puede arrebatárselo. Sobre eso no hay duda alguna".

Ya antes hemos señalado también que por tratarse de derechos fundamentales (los de expresión), estamos obligados "a su más celosa protección", *P.R.T.C. v. Unión Indep. Emp. Telefónicos*, 131 D.P.R. 171 (1992); *Rodríguez v. Srio. de Instrucción*, 109 D.P.R. 251, 255 (1979). También hemos resuelto que los maestros de escuelas públicas tienen derecho a ejercer su libertad de expresión y de asociación, aun dentro de los predios escolares, que de ordinario no son lugares preferidos para ello. *Rodríguez v. Srio. de Instrucción*, supra, págs. 257–258. Tanto más pueden ejercerlos, cuando lo hacen, como sucedió en este caso, durante el día en foros públicos considerados tradicionalmente como los

sitios por excelencia para la expresión de ideas y para la crítica al Gobierno. Más aún, expresamente hemos resuelto que dentro de nuestro orden constitucional no es permisible que para ocupar un empleo público, una persona tenga que renunciar al ejercicio de su derecho a la libre expresión. *Velázquez Pagán v. A.M.A.*, 131 D.P.R. 568 (1992).

Claro está, ni siquiera los fundamentales derechos de expresión y de asociación son absolutos. Su plena vigencia y protección presupone que serán ejercitados, respetándose los derechos esenciales de otras personas y los intereses apremiantes de la colectividad, como corresponde en un sistema de libertad ordenada como es el nuestro. Así, pues, los piquetes de protesta no gozan de protección constitucional si se realizan de manera estrepitosa, en horas de la noche y en un área residencial privada. *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975). Tampoco puede el empleado público utilizar los medios y recursos que su cargo pone a su alcance para adelantar fines político-partidistas, *Herminia González v. Srio. del Trabajo*, 107 D.P.R. 667 (1978), o para adelantar sus propios intereses laborales en detrimento de la integridad de las funciones gubernamentales, *U.N.T.S. v. Srio. de Salud*, 133 D.P.R. 153 (1993).

## III

A la luz de estos principios, es evidente que el piquete de protesta de los maestros en cuestión, *como tal*, constituía una conducta claramente protegida por nuestra Constitución. Fue una actividad pacífica, realizada ordenadamente en lugares propios para ello, durante horas del día, y *con el propósito de dilucidar un asunto público legítimo*. Si bien los maestros se ausentaron de su trabajo para participar en este piquete, ello de por sí no lo convertía en una actividad ilícita y repudiable, como la catalogó el

Secretario. La falta incurrida por los maestros en este caso, de utilizar horas laborables para asistir al piquete, ameritaba el descuento salarial que les fue impuesto. Pero, como fue únicamente *una ausencia de un solo día,* un evento aislado, claramente diferente de un paro laboral indefinido, el Secretario no tenía autoridad para manchar el expediente personal de estos maestros de la manera flagrante en que lo hizo, ni para intimidarlos de ese modo con respecto a futuros piquetes de protesta. La amonestación del Secretario, redactada en la manera ya relacionada, constituía un rechazo enérgico no sólo a la ausencia del trabajo, sino también a la libre expresión de ideas y a la crítica del Gobierno. Su amenaza de sanciones más severas no se limitó a futuras ausencias, sino que era extensiva también al ejercicio de los derechos más fundamentales que garantizan nuestra Constitución, que el Secretario está compelido a respetar.

## IV

Hay otra vertiente que debe ponderarse en este caso. Uno de los elementos más importantes y fundamentales de nuestra propia Carta de Derechos es la responsabilidad que se le encomienda al sistema de instrucción pública del país de *impartir una educación que propenda al fortalecimiento del respeto de los derechos humanos y de las libertades fundamentales.* Art. II, Sec. 5 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Los que formularon nuestra Carta de Derechos pensaron que para asegurar el pleno disfrute de estos derechos y libertades, no bastaba con sujetar al Estado a ellos. Tampoco bastaba con la celosa protección que los tribunales le brindasen. Para ellos, el logro de tan elevado fin hacía necesario, además, asignarle al sistema de instrucción pública el cometido de impartir una educación que procurase

inculcar en sus estudiantes el respeto a esos derechos y libertades. La fe en la educación de los autores de nuestra Constitución los llevó, pues, a constituir la instrucción pública en uno de los pilares sobre los cuales erigir una sociedad auténticamente libre y democrática. Véase J.B. Fuster Berlingeri, *Constitucionalismo y Educación*, Año XXVII (Núm. 102) Rev. Der. Pur. 321–329 (1988).

A la luz de lo anterior, cabe preguntarse si el logro de la grave encomienda constitucional que se le hace al sistema de instrucción pública puede lograrse cuando su director principal desdeña que los maestros ejerzan sus derechos de expresión. Cabe preguntarse más aún si esa grave encomienda puede lograrse cuando los propios maestros han sido castigados e intimidados por ejercer esos derechos.

Lo que se espera de todo un Secretario de Educación, a la luz del entramado constitucional sobre los derechos humanos y las libertades fundamentales, no es una conducta autoritaria y represiva, sino precisamente todo lo contrario: un proceder ejemplarizante y una altura de miras que propicie el logro de la ingente encomienda que fija la Constitución.

Como en el caso de autos, la amonestación escrita en cuestión no compagina cabalmente con lo que manda y encarga la Constitución del Estado Libre Asociado de Puerto Rico, disiento del dictamen mayoritario que la avala en su totalidad.